```
                    UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
                      ALEXANDRIA DIVISION

UNITED STATES EX REL        .        Civil Action No. 1:09cv296
PAUL FUNK,                  .
                            .
             Plaintiff,     .
                            .
      vs.                   .        Alexandria, Virginia
                            .        September 23, 2010
MISSION ESSENTIAL PERSONNEL,.        10:00 a.m.
LLC; LANGUAGE LEARNING      .
ENTERPRISES, INC.; and CEIBA.
ENTERPRISES, INC., d/b/a    .
GRACOR LANGUAGE SERVICES, INC..
                            .
             Defendants.    .
                            .
.   .   .   .   .   .   .   .   .   .
```

```
                  TRANSCRIPT OF MOTIONS HEARING
            BEFORE THE HONORABLE LEONIE M. BRINKEMA
                  UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

```
FOR RELATOR:                   KIT A. PIERSON, ESQ.
                               Cohen Milstein Sellers & Toll PLLC
                               1100 New York Avenue, N.W.
                               Suite 500, West Tower
                               Washington, D.C. 20005
                                 and
                               MARK HANNA, ESQ.
                               MICHELLE WOOLLEY, ESQ.
                               Murphy Anderson PLLC
                               1701 K Street, N.W., Suite 210
                               Washington, D.C. 20006
                                 and
                               SCOTT NEWAR, ESQ. (by telephone)
                               700 Louisiana, 25th Floor
                               Houston, TX 77002
```

```
           (APPEARANCES CONT'D. ON FOLLOWING PAGE)

                      (Pages 1 - 22)

        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

2

<u>APPEARANCES</u>:  (Cont'd.)

FOR DEFENDANT MISSION            ANTHONY H. ANIKEEFF, ESQ.
    ESSENTIAL PERSONNEL:         ADAM G. CASAGRANDE, ESQ.
                                 WILLIAM A. WOZNIAK, ESQ.
                                 Williams Mullen
                                 8300 Greensboro Drive, Suite 1100
                                 McLean, VA 22102

FOR DEFENDANT LANGUAGE           MAURICE A. BELLAN, ESQ.
    LEARNING ENTERPRISES:        JACKSON D. TOOF, ESQ.
                                 Arent Fox LLP
                                 1050 Connecticut Avenue, N.W.
                                 Washington, D.C. 20036-5339

FOR DEFENDANT CEIBA              RYAN A. CORLE, ESQ.
    ENTERPRISES, INC.:           DWIGHT D. MURRAY, ESQ.
                                 Jordan Coyne & Savits, L.L.P.
                                 1100 Connecticut Avenue, N.W.
                                 Suite 600
                                 Washington, D.C. 20036

ALSO PRESENT:                    ROBERT COZZIE

OFFICIAL COURT REPORTER:         ANNELIESE J. THOMSON, RDR, CRR
                                 U.S. District Court, Fifth Floor
                                 401 Courthouse Square
                                 Alexandria, VA 22314
                                 (703)299-8595

P R O C E E D I N G S

THE CLERK:  Civil Action 09-296, Paul Funk v. Mission Essential Personnel, LLC, et al.  Would counsel please note their appearances for the record.

MR. HANNA:  Good morning, Your Honor.  Mark Hanna of Murphy Anderson.  I'm here with lead counsel, Mr. Kit Pierson, whose pro hac vice was submitted yesterday, Your Honor.  I'm also here with Michelle Woolley of my firm, and Scott Newar, who's on the phone, of Houston, Texas.

THE COURT:  All right, that's fine.

MR. HANNA:  Thank you, Your Honor.

THE COURT:  And we'll take care of the paperwork on the pro hac matter when it comes upstairs.

MR. PIERSON:  Thank you, Your Honor.

MR. ANIKEEFF:  Good morning, Your Honor.  My name is Anthony Anikeeff.  I'm a partner with Williams Mullen.  I represent the men and women of Mission Essential Personnel.

With me in court today is my partner, Adam Casagrande, and beside him a representative of MEP, Robert Cozzie.

THE COURT:  All right.

MR. ANIKEEFF:  I also have an associate, Will Wozniak, who I will be moving for admission on the uncontested motion docket, if that's all right, Your Honor.

THE COURT:  Pro hac or admission to the Court itself?

MR. ANIKEEFF:  Admission to the Court.  We checked with

4

1    your office yesterday.

2              THE COURT:  All right, that's fine.

3              MR. CORLE:  Good morning, Your Honor.  My name is Ryan

4    Corle, with the law firm of Jordan Coyne & Savits.  I represent

5    Ceiba Enterprises, LLC, and with me this morning is my colleague,

6    Dwight Murray, who has been admitted pro hac.

7              THE COURT:  All right, good morning.

8              MR. TOOF:  Good morning.  My name is Jackson Toof, from

9    the law firm of Arent Fox LLP.  I represent Language Learning

10   Enterprises.  With me is lead counsel, Maurice Bellan, and his pro

11   hac vice has been admitted.

12             THE COURT:  All right, very good.

13             Why don't we take care of the preliminary matter now for

14   the one attorney.  Do you have the paperwork with you?

15             MR. ANIKEEFF:  Yes, Your Honor.  It's -- would you step

16   forward?

17             Your Honor, it's my pleasure to introduce and move the

18   admission to the bar of this Court of William Alexander Wozniak.

19   He is an associate in the law firm of Williams Mullen.  He is

20   working with us on this case.

21             I have known Will for some time.  He is an upstanding

22   person, a person of good character, a good lawyer, and I believe

23   he would do credit to the bar of this Court.

24             THE COURT:  All right.  Mr. Wozniak, where did you go to

25   law school?

5

1          MR. WOZNIAK:  George Washington.

2          THE COURT:  And how about your undergraduate work?

3          MR. WOZNIAK:  Virginia Tech.

4          THE COURT:  So you're a local person.

5          MR. WOZNIAK:  I am.

6          THE COURT:  Very good.  And how long have you been

7    practicing?

8          MR. WOZNIAK:  About eight months.

9          THE COURT:  All right.  Well, we're pleased to grant the

10   motion, and the clerk will administer the affirmation to you at

11   this time.

12                    (Attorney affirmation administered.)

13         THE COURT:  All right, Mr. Wozniak, when the proceedings

14   are over, if you take this form down to the Clerk's Office,

15   they'll arrange for your certificate, and I think we'll probably

16   be seeing you in court for a while.

17         MR. WOZNIAK:  Thank you.

18         THE COURT:  Thank you.

19         All right.  Now, that takes care of all of the

20   preliminary matters, although I did not hear anybody from the

21   United States government enter an appearance.  Is there anyone

22   here from the government?  They were notified about this hearing.

23                         (No response.)

24         THE COURT:  Have plaintiff's counsel had any contact

25   with anyone from the United States Attorney's Office?

6

1          MR. HANNA:  Yes, Your Honor.  I asked if they were going

2     to file any papers, and I heard that they were not going to file

3     papers, but I usually expect to see them here in False Claims Act

4     matters, so I don't know the answer to the question.

5          THE COURT:  Well, especially when a motion to dismiss is

6     at issue.

7          MR. HANNA:  Yes, Your Honor.

8          THE COURT:  All right.  Well, for the record, they were

9     noticed on all of the proceedings.  They know about the hearing,

10    and they're not here.  I deem that to be a waiver of any position

11    the government can take at this point.

12          All right, what is before the Court this morning are the

13    motions of all three defendants to dismiss the complaint for

14    failure, frankly, to comply with the heightened pleading

15    requirements of Federal Rule of Civil Procedure 9(b) and 12(b)(6)

16    as well, but 9(b) is the real problem for false claims cases,

17    because it has a significantly higher pleading standard.

18          I'm not sure yet whether in the aftermath of *Iqbal* and

19    *Twombly*, which would be the stricter pleading standard at this

20    point, because as you know, under *Iqbal-Twombly*, the pleadings

21    have to establish -- or allege specific facts to provide that it's

22    plausible that the plaintiff could prevail on a particular cause

23    of action, and I don't believe that 9(b) talks about plausibility,

24    but those are two different documents, but they both point to the

25    same fact and the same concern, which is that given the expense of

1    civil litigation, it's quite clear the message is being sent that

2    the courts are going to become stricter and stricter about

3    reviewing complaints to make sure that that expensive discovery

4    process does not start if there is not truly an indication of a

5    meritorious case.

6            And one of the problems I think the plaintiff has here

7    at least as to the two subcontractors, the more newly added

8    defendants who I think were just added in the first amended

9    complaint language -- I'm sorry, Learning Language Enterprises,

10   Inc., and Ceiba Enterprises, Inc., there really are no specifics

11   that are alleged whatsoever in that first amended complaint that

12   would comply either with 9(b) or *Iqbal-Twombly*, so I'd like the

13   plaintiff to first of all address that issue, and you have

14   requested in the alternative to just a straight dismissal, that

15   the Court dismiss without prejudice and give you an opportunity to

16   file a second amended complaint.

17           I guess what I want to know is if you were to file a

18   second amended complaint, I want an idea of the kind of

19   specificity you'd have available to you as to these other two

20   defendants.

21           MR. PIERSON:  Thank you very much, Your Honor.  I'm Kit

22   Pierson from Cohen Milstein.

23           Let me make a few observations and then get to your

24   question, which I agree is central to this.  Now, I should tell

25   you in all candor that I've been retained in this case in the last

1  week and --

2       THE COURT:  We knew you were new to the case, yeah.

3       MR. PIERSON:  And I agreed to that retention, Your

4  Honor, frankly, because I have worked with the Guantanamo

5  detainees for years and had a sense of how important translation

6  was and after speaking extensively with the relator felt strongly

7  that this was a case we should be involved in.

8       There are, of course, disadvantages and advantages.  The

9  disadvantages may be more obvious about appearing in a case so

10  recently.  The disadvantage is that my familiarity with the facts

11  is getting up the curve, and I will be the first to admit that.  I

12  think one of the advantages is that I do come to the case with a

13  fresh set of eyes and a bit of perspective, and I think your

14  question goes right to that.

15       Here is basically my perspective on the complaint and

16  where we are in your question.  I think the case against MEP, I

17  don't think there's a substantial argument that there should be a

18  motion -- that the case against MEP should be dismissed, and

19  presumably I'll have some chance to elaborate on that today, but I

20  think that's just a bedrock False Claims Act case.

21       I agree with Your Honor that the allegations against the

22  two, the two other defendants are conclusory in the complaint and

23  that that raises an issue under *Twombly-Iqbal* or under rule 9(b),

24  so I want to give you my perspective on that.

25       First, I think as a matter of law, the defendants

9

1  basically have it wrong.  I mean, there's a little bit of -- I

2  guess the law is a little bit unsettled with sort of how you deal

3  with these coconspirators in the false claims situation

4  post-*Twombly* and *Iqbal*, but where I think the law is probably

5  going is that, is that what needs to be shown here is not that

6  each of these defendants submitted false claims but that they --

7  there was sufficient allegations that they participated in a

8  conspiracy to violate the False Claims Act and that there was, in

9  fact, an overt act by any of the defendants in furtherance of that

10 conspiracy.

11         There clearly were overt acts here, so fundamentally the

12 question is whether, whether there's evidence that they engaged in

13 a conspiracy and whether it's sufficiently specific to satisfy the

14 requirements at least of *Twombly* and *Iqbal*, specific and

15 plausible.

16         And I agree with you that the allegations that are in

17 the complaint as currently drafted are, they are conclusory, so

18 there are a couple observations I would make about that.  One, I

19 do believe based on the investigation we've done so far that we

20 can make specific allegations against these other defendants that

21 would be sufficient to get beyond a motion to dismiss for purposes

22 of alleging a conspiracy.

23         Some of those allegations -- and this goes to your

24 specific question -- is that, that they were using a practice that

25 everyone in the industry knew would facilitate fraud.  The

1   practice of using these oral exams, where all they're doing is

2   getting somebody on the phone, is a little bit like letting

3   someone take the bar exam over the phone, but it's even worse in

4   this context, because these are $200,000-a-year jobs that may go

5   to people that are otherwise relatively unskilled that have no

6   alternative, so anyone that was experienced in the industry such

7   as these defendants would know that the basic practice they were

8   using was inviting fraud.

9           If we amend the complaint against these defendants, we

10  would allege that Mr. Funk was told by one of his subordinates

11  that LLE was giving passing grades to people that had turned in

12  blank sheets of paper on written exams.

13          THE COURT:  And he can identify the subordinate who told

14  him that?

15          MR. PIERSON:  He can identify the person that told him

16  that.  We can also identify seven or eight individuals where we

17  believe that occurred based on what he was told.

18          We would also allege that failing test scores -- that

19  after he complained about people have failing test scores -- and

20  the test scoring, as we understand it, was done by LLE and its

21  successor -- after, after failing test -- after he learned of

22  failing test scores, the scores were changed for some of those

23  applicants, so that only days after he had learned that they were

24  failing, they suddenly were no longer failing scores.

25          The last allegation that is specific to these -- and

1    frankly, Your Honor, at this point, I want to be very clear in my

2    own mind before we amend the complaint about there's a transition

3    from LLE to the successor Gracor, or Ceiba, and I'm going to need

4    to be clear when we amend the complaint on what the timeline is on

5    these, you know, when they transition from one defendant to the

6    other defendant.

7            I don't want to make any -- I'm not in a position to

8    make representations about that to you now, so I want to get a

9    clear understanding of that, but the other fact that Mr. Funk

10   learned was that some of the people taking written tests were

11   using a cheat sheet, and the cheat sheet was a test form -- as I

12   understand it, it was a test form from, from either LLE or the

13   successor company that basically gave the questions that were

14   going to be asked on the exam and then gave them English

15   translations of what the right answers was, and that's something

16   Mr. Funk knows from his personal knowledge, because they

17   confessed -- several of the applicants after being confronted with

18   this and after the cheat sheet was found confessed to him that

19   they did have a cheat sheet.  So someone was giving them the

20   answers from the -- the questions and answers from the testing

21   service.

22           What, what I believe, Your Honor, from all that is

23   basically two things:  One, I think there is a substantial basis

24   for alleging that they were, in fact, participants in the fraud

25   and for inferring from that that there was a conspiracy.  They had

1   no incentive to do this on their own.  They had an incentive to do

2   it if they were doing it in concert with MEP, who had

3   subcontracted to them.

4           So based on what I know right now, I mean, I do want to

5   be clear about the timelines as we do our investigation.  There

6   are allegations of co-conspiracy that could be made against one or

7   both of these testing companies.

8           The one issue that I would say, frankly thinking about,

9   is what is clear as we go forward is that there's going to be a

10  lot of discovery focused on MEP, and there will necessarily be

11  discovery related to these other entities, whether they're third

12  parties or whether they're defendants, and the question that I'm

13  wrestling with in my early entry in the case is whether the more

14  sensible thing to do is go ahead and proceed with that discovery

15  against them and to see where it leads and to see how substantial

16  the case against them is and whether they really are -- whether it

17  rises to a level that really makes it not just legally sufficient

18  but appropriate to proceed with them as a defendant in the case or

19  whether the better course would be just to proceed against MEP.

20          So what I think the bottom line on that is for me, Your

21  Honor, is that what we would request to do, regardless of the

22  disposition of this motion, we will be seeking leave to amend the

23  complaint within two or three weeks, depending on what the Court

24  permits, and, and the allegations that I just made will

25  undoubtedly be in the amended complaint, and I think the judgment

1   we'll need to make is whether it's appropriate at that time to

2   name the other, the other current defendants as coconspirators, to

3   include them as defendants, or to simply include the allegations

4   and see where discovery takes us and find out the scope of their

5   involvement, and frankly, at this point, Your Honor, I haven't

6   made a decision about, about what the most appropriate way to

7   proceed in that regard is.

8           THE COURT:  All right.

9           MR. PIERSON:  That was a long answer to your question,

10  and I apologize.  Did I answer your question?

11          THE COURT:  You did actually, yes.  I mean, I'm

12  concerned about this case because the allegations are very

13  serious.  The issue of possible fraud against the United States

14  government in connection with the war in Afghanistan and this

15  issue of translators -- this is not the first case we've had

16  involving translator services issues -- is very troubling to me.

17          I -- from what the government indicated during the time

18  period the case was under seal, and they apparently are still

19  looking at it themselves independently, and I guess at any point,

20  they could choose to come in, correct?

21          MR. PIERSON:  They could, Your Honor.

22          THE COURT:  Yeah.  Obviously, there's a lot at stake in

23  this case, especially for Mission Essential Personnel, which is a

24  significant government contractor, there's also a lot of issue in

25  this case.  If they were found to be liable on any of these

1  claims, I suspect they would be facing significant debarment

2  potential, and you can see where I'm going with that as well, and

3  that is, a case like this, if it hasn't already been looked at,

4  should be considered by counsel for possible early settlement.  I

5  would suspect that the discovery in this case could be fairly

6  complicated.

7           Now, these translators, some of them are overseas

8  people, correct?

9           MR. PIERSON:  They are, Your Honor, some of them.

10          THE COURT:  And so we just had a case like this where

11 there were going to be, I don't know, 20 or 30 depositions that

12 were going to have to be taken in the Middle East.  That is

13 logistically and financially complicated.  It's doable, but it's

14 something that counsel on all sides should be thinking about.

15          Given the position that Mr. Funk had, as I understand

16 it, sort of as the reviewer of this process at one point, I would

17 think that he would have pretty good access to the information.

18 As I read the complaint, I mean, this is a complaint where the

19 complainant says he has direct knowledge, not this is inferential,

20 which impressed me.

21          And some of the issues in this case struck me as being

22 fairly concrete.  There's the DOMEX billing matter.  I would have

23 assumed that both the defendant and -- MEP and the plaintiff would

24 already have some discovery or some idea about the specifics of

25 that.

1          MR. PIERSON:  Yeah.  In fact, Your Honor, from speaking

2     with Mr. Funk, I would just note -- and, of course, time will bear

3     this out or it won't -- I got involved in this case, I believe

4     that Mr. Funk is highly credible and, in fact, in some respects a

5     hero, and I base that not only on years of work in connection with

6     Guantanamo, which gives me some familiarity with this, but almost

7     30 years in the practice of law, and that is why I became involved

8     in the case.

9          With regard to DOCEX and DOMEX, my understanding is

10    that, is that we do have pretty specific information that we can

11    add to this.  I mean, the basic allegation relating to DOMEX is

12    pretty straightforward.  People were only working 10 hours a week

13    and were routinely being billed at 40 hours a week to the

14    government, and the allegations get a little uglier than that, but

15    that's, that's the guts of it, and my understanding is that we

16    actually -- we're certainly in a position to describe the time

17    period in which that occurred, the location at which it occurred,

18    the method by which it occurred, the invoices on which it

19    occurred, not on an invoice-specific basis but the nature of the

20    invoices, and I think we can also list the individuals for whom we

21    believe that occurred.

22         THE COURT:  All right.  Well, that obviously would be

23    the icing on the cake --

24         MR. PIERSON:  Yeah.

25         THE COURT:  -- and so what I am going to do is I am

1   granting all three motions to dismiss.

2           I'm going to dismiss the first amended complaint as of

3   today without prejudice.  I'm going to give you -- we've already

4   got a discovery order -- schedule in this case, so I can't give

5   you too much time.  I think two weeks is more than sufficient.

6           MR. PIERSON:  That's fine.

7           THE COURT:  And I do expect based upon the comments in

8   court today that you will be extremely judicious in looking at how

9   you structure that second amended complaint.

10          I also strongly suggest if your evidence is as concrete

11  and strong as you say it is, you know, in civil cases, you really

12  don't benefit by hiding stuff.  I'd start talking with opposing

13  counsel.  If it's there, it's there, and they will be able to then

14  evaluate what their positions ought to be.  All right?

15          MR. PIERSON:  Your Honor, I'm just in complete agreement

16  with the observations you're making.  I mean, we appreciate the

17  gravity of the allegations for the defendants to some degree from

18  Mr. Funk, but most importantly for what's going on in Afghanistan,

19  and if there's a way to have a frank dialogue with them and share

20  the information that we have and expedite discovery with them and

21  to see if, see if there are ways to resolve this in a sensible way

22  that perhaps as importantly as anything else furthers the mission

23  overseas, we are totally receptive to all of that.

24          THE COURT:  Now, remember, the government has to sign

25  off.

1              MR. PIERSON:  Well, I understand, Your Honor.

2              THE COURT:  And I should tell you, Judge Anderson is

3       phenomenal at settling cases.  He's the magistrate judge assigned

4       to this case.  If you feel you can't do it by yourselves, you

5       would be extremely wise to ask him to intervene as quickly as

6       possible, because you do have, you know, the scheduling order is

7       an issue, and your discovery cutoff is January 14.

8              MR. PIERSON:  Could I ask you one question, Your Honor?

9              THE COURT:  Yeah.

10             MR. PIERSON:  Which is -- because I'm acutely aware of

11      the discovery schedule and what it has done to my December 30

12      birthday, and I guess the one issue about amending the complaint

13      is I would -- we would like to get discovery requests out to them

14      soon, and the only issue in my mind is whether we now need to wait

15      until the complaint is amended.

16             THE COURT:  You do not.  I mean, that clock is ticking.

17      Both sides can be making discovery demands upon each other, all

18      right?

19             MR. PIERSON:  All right.  Thank you very much, Your

20      Honor.

21             THE COURT:  Do I need to hear anything from defense

22      counsel?  I mean, as I said, I would strongly suggest at this

23      point, it's early on in the game, that you think about talking

24      concretely with opposing counsel, and if you think getting with

25      Judge Anderson early on would help, feel free to do so.

1          Yes, sir.

2          MR. ANIKEEFF:  Your Honor, if Your Honor has made her

3   ruling --

4          THE COURT:  I have.

5          MR. ANIKEEFF:  -- then we'll accept it.

6          We could ask to reconsider on the grounds that we

7   strongly believe that plaintiff, who has had this case for a year

8   and a half, he is the consummate insider.  He says he knows all

9   the facts.  His complaint was strewn with the names of many people

10  at MEP, and not once has he come forward with a specific

11  allegation.

12         THE COURT:  Well, I have to tell you I understand that.

13  I mean, I've read your briefs, and I know that you feel they've

14  already had one opportunity to amend, but in terms of the

15  complaints that come through here, there's far more meat on the

16  bones of this complaint than there is on the standard civil one,

17  quite frankly.

18         Now, I understand it's a false claims case.  Even

19  then -- and, you know, the exhibits that were attached, now, they

20  were not 100 percent genuine in the sense that they were

21  represented to be MEP documents, and, in fact, they were spread

22  sheets made from MEP data, as I understand it.

23         Nevertheless, that's a lot of specificity, and, you

24  know, when a plaintiff puts that degree of specificity in the

25  complaint, it really is -- it really does put the plaintiff at

1    some exposure.  I have seen at trial very effective use made of

2    allegations in a complaint for which there was no evidence or

3    contradictory evidence during the trial, and I have seen some very

4    fine trial attorneys reading from the verified complaint to the

5    jury, saying, you know, this is what the plaintiff said to the

6    Court under a verified statement:  Blah, blah, blah, blah, blah,

7    and, folks, there was no evidence of that whatsoever in this case,

8    or we've shown just the opposite.  So -- and we have experienced

9    counsel representing the plaintiff.

10        But I do think in this case -- and part of it is the

11   gravity of the issues involved.  The war contracting problems are

12   real, and I want to make sure that we've addressed all those cases

13   very carefully, but in this case, I have ruled.

14        I recommend strongly you think early on about

15   settlement, if that's a potential, and again, the government would

16   have to be involved, which does make these types of settlements

17   complicated.  I've done them before, and I know how that can

18   happen, but within two weeks, you'll see the amended complaint.

19   That will be the second amended complaint.  We seldom allow a

20   third, so I want everybody on notice.

21        And then I'll give the defendants ten days to respond

22   either through -- have you answered yet?

23        MR. ANIKEEFF:  No, Your Honor.

24        THE COURT:  You have not.

25        MR. ANIKEEFF:  We moved to dismiss.

1          THE COURT:  Then you'll have ten days in which to file

2   an answer to the second amended complaint or another round of

3   dispositive motions.

4          MR. ANIKEEFF:  Your Honor, we're going to make one other

5   request.  For whatever reason, Mr. Funk has seen that litigating

6   this case in court is not enough.  He's appeared on nationwide TV,

7   on *ABC News*, on *Nightline*, and in various media.

8          We would request that the Court order or direct Mr. Funk

9   to confine his litigation to this case in this Court so that we

10  don't also have to fight this battle on the public airwaves.  In

11  *Harrison I*, the court said that one of the reasons for a motion to

12  dismiss is so that the reputation of a company such as Mission

13  Essential Personnel would not be sullied.

14         Your Honor has already indicated how severe these

15  applications are, and they stick on a wall like mud on an

16  unplastered wall, and it's going to take a long time for MEP to

17  clean that wall, and we're going to do it through this Court, but

18  it doesn't help when it's carried on in the media, where we don't

19  have an equal opportunity and our name continues to be sullied,

20  and it was why we did move to dismiss, because we believe however

21  severe the allegations are, they were not substantiated.

22         Your Honor has ruled.  We will deal with the amended

23  complaint appropriately, but we'd ask that this litigation be

24  confined to this Court.  Thank you.

25         MR. PIERSON:  Your Honor, what I would suggest -- I will

1  tell you --

2       THE COURT:  You've got a great voice, but I still want

3  you at the lectern.

4       MR. PIERSON:  I will tell you, Your Honor, that perhaps

5  to a fault, it has never been my practice to litigate cases in the

6  media.  It's not something I'm very comfortable with, and it's not

7  what I do.

8       With that said, as Your Honor's comments reflect, this

9  is a matter of enormous public concern, and what I would suggest

10  since this issue is essentially being raised for the first time

11  here, if they're seriously suggesting there should be a gag order

12  of some sort on Mr. Funk, that that's an issue that should be

13  briefed.

14       THE COURT:  I'm not imposing a gag order.  In criminal

15  cases, there's a different kind of concern.  At this point, you

16  know, you're all significantly experienced counsel.  It's

17  dangerous for a party litigant to get out there and say things in

18  the public.  Again, it can come back to haunt at the trial.

19       I think, you know, you-all are good counsel.  You should

20  talk with your client and appropriately control him, but he has a

21  First Amendment right to speak, as does the defendant, who can

22  also speak to defend itself, and at this point, I -- of course, I

23  don't spend a lot of time with the media -- will start looking for

24  public comment on this case from here on out, but I haven't seen

25  it come up a great deal where it's gotten my attention.  When I

22

1   have a case and I hear things in the press about it, I usually

2   remember it.

3          So that's all I'm going to do at this point, but I'm not

4   a big fan of gag orders, so the request is denied.

5          MR. PIERSON:  Thank you, Your Honor.

6          THE COURT:  If something else happens and something gets

7   worse or if there's some problem with confidential information

8   that's getting leaked out, that's a different situation, all

9   right?

10         All right, we'll recess court until 3:00.

11                       (Which were all the proceedings

12                        had at this time.)

13

14              CERTIFICATE OF THE REPORTER

15     I certify that the foregoing is a correct transcript of the

16   record of proceedings in the above-entitled matter.

17

18

19                    _____
                                /s/
20                        Anneliese J. Thomson

21

22

23

24

25