**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| UNITED STATES EX REL. PAUL FUNK, <br><br> Plaintiff, <br><br> v. <br><br> MISSION ESSENTIAL PERSONNEL, LLC, <br><br> Defendant. | Case No. 1:09-cv-296 (LMB/JFA) <br><br> Jury Trial Demanded |

## RELATOR'S SECOND AMENDED COMPLAINT

Qui Tam Relator Paul Funk ("Relator" or "Mr. Funk") brings this Second Amended Complaint in the name of the United States Government for false claims that were submitted or caused to be submitted to the United States Government by Defendant Mission Essential Personnel, LLC ("Defendant" or "MEP"), and to recover damages and other relief based on Defendant's discriminatory and retaliatory conduct in violation of 31 U.S.C. § 3730(h).  As set forth below, Defendant MEP has engaged in a fraudulent scheme, prepared and submitted false records, and made numerous false claims to the United States in connection with its receipt of hundreds of millions of dollars from the United States for providing purportedly qualified linguists to aid the United States in ongoing military operations and war efforts.  Moreover, when Relator repeatedly acted to determine the scope of this fraudulent and unlawful conduct, repeatedly informed MEP management of this fraudulent and unlawful conduct, repeatedly acted to make MEP cease this unlawful conduct, and otherwise engaged in protected activity under the False Claims Act, MEP responded by reducing Relator's job responsibilities, impeding his ability to investigate this misconduct, and ultimately forcing him from his job at MEP.  Relator

has brought this action, both on behalf of the United States and as a result of discrimination and retaliation he was subjected to by MEP, and respectfully seeks an award of all damages, penalties, attorneys fees and expenses, and other relief available under the False Claims Act.

## I.    INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of America ("United States") arising from false statements and claims made and presented by Defendant Mission Essential Personnel, LLC ("Defendant" or "MEP") and its agents, employees, and/or co-conspirators in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended ("the Act").  The violations consist of presenting false claims and making or using false records or statements to cause false claims to be paid, in connection with MEP's claims for payment for the provision of linguists (and reimbursement and payment for related work and expenses as set forth below) to the United States, and its discrimination and retaliation against the Relator in response to his protected activities.

2.      The False Claims Act provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the United States for payment or approval is liable for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim submitted or paid, plus three times the amount of the damages sustained by the United States.  31 U.S.C. § 3729(a).  Liability attaches both when a defendant knowingly seeks payment that is unwarranted from the United States and when false records or statements are knowingly created or caused to be used to conceal, avoid, or decrease an obligation to pay or transmit money to the United States.  *Id.*  The Act allows any person having information regarding a false or fraudulent claim against the United States to bring an action for himself (the "Relator") and for the United States and to share in any recovery.  *Id.* § 3730(b), (d).

3.      The False Claims Act further provides that any employee discriminated against "shall be entitled to all relief necessary to make the employee . . . whole." *Id.* § 3730(h)(1). Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. *Id.* § 3730(h)(2). Special damages therefore include damages for emotional distress.

4.      Based on those provisions, Relator, Paul Funk, seeks to recover damages and civil penalties arising from Defendant MEP's presentation of false records, claims, and statements to the United States and its agents in connection with the Defendant's claims for payment for services required to be performed under a contract with the United States military, as well as appropriate damages and other relief based on its discriminatory and retaliatory conduct. Defendant's actions were designed to maximize profits illegally at the government's expense. The nature of this fraudulent and unlawful scheme is set forth below.

## II.      JURISDICTION AND VENUE

5.      The Court has jurisdiction over the subject matter of this action pursuant to both 29 U.S.C. § 1331 and 31 U.S.C. § 3732(a), the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

6.      The Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process and because the Defendant can be found, transacts business, and/or presented the actionable false claims to the United States in the Eastern District of Virginia.

7.     Venue is proper in the Eastern District of Virginia pursuant to 31 U.S.C.

§ 3732(a) because the Defendant can be found, transacts business, and/or presented actionable

false claims to the United States in the Eastern District of Virginia.

## III.   PARTIES

8.     Relator Paul Funk is a United States citizen and resides in Virginia.

9.     Defendant Mission Essential Personnel, LLC ("Defendant" or "MEP") is an Ohio

limited liability company headquartered at 4343 Easton Commons, Suite, 100, Columbus, Ohio

43219.  MEP has "major offices" in Chantilly and Lorton, Virginia.

## IV.   FACTS

### A.   The Formation and Growth of MEP

10.     MEP represents that it is a "global professional services company" headquartered

in Columbus, Ohio.  MEP was formed in 2004 as Aegis Mission Essential Personnel, LLC.

According to the company, "[b]y any standard – facilities, revenues, or staff size – MEP's

growth since its 2004 founding has been remarkable.  The company has expanded from a small

business with a handful of employees to an industry leader with prime contracts and delivery

orders around the world."  In 2008, the company dropped "Aegis" from its name and became

Mission Essential Personnel, LLC.

11.     From 2004 to 2007, MEP served as a subcontractor, primarily involved in

providing linguists for military operations pursuant to contracts with the United States.

According to Marc Peltier (MEP's Chief Operating Officer), the company won a $700 million

contract with the United States in 2007 to provide linguists to support United States military

operations in Afghanistan.

12.     MEP has continued to provide linguists for United States military operations,

including operations in both Iraq and Afghanistan, since that time.  In August 2010, the

Company reported that it was one of six companies nationwide awarded an omnibus support services contract through the Army Intelligence and Security Command.  According to *Columbus Business First*, "[t]he five-year contract has a ceiling of $492.4 million and is labeled indefinite delivery/indefinite quantity."

13.     MEP's website includes a Department of Defense press release announcing that MEP is continuing to provide translation and interpretation services pursuant to contractual agreements with the United States.  According to this announcement, "Mission Essential Personnel . . . was awarded on May 7 a $679,000,000 indefinite-delivery/indefinite-quantity with cost-plus-award fee contract.  This contract action seeks the continuation of linguist/translation services which provide our forces with the ability to communicate effectively with the local populace, gather information for force protection, and interact with foreign military units in Afghanistan."

14.     MEP represents that its "Mission is to Deliver Certainty to its Customers."  MEP claims that it has "[a]n unrivaled array of advanced language resources" and is "a trusted source of qualified and cleared linguists."

15.     MEP's "remarkable" growth has been fueled by its receipt of contracts with the United States Government, most significantly since 2007.

16.     In securing hundreds of millions of dollars in payments from the United States, MEP is well aware that the provision of capable and effective linguists is critically important to the effectiveness of military operations and the safety of military personnel.  Testifying before Congress, MEP's chief executive officer stated that "[u]nlike the relatively straightforward conflicts of the 20th Century, the global war on terror is a conflict where communication is a more important force multiplier than weaponry.  Army Major Cory Schulz, who served in the

Paktika province of Afghanistan, has stated that 'your interpreter is way more important than your weapon.'  As noted in *The New York Times*, Major Schultz went on to explain that with an interpreter, you can command hundreds of Afghan soldiers; with a gun, you can only defend yourself.  The United States needs reliable communication to share our message of goodwill with those we can help while deciphering the hidden messages of those who seek to do us harm."

17.     David Chu, former DOD undersecretary for personnel and readiness, told the *Washington Post* that "[p]erhaps most significant, language competence is now embraced by many senior leaders as a military skill equal in importance to the skills traditionally emphasized."  Nancy Weaver, director of the Defense Language Office, added that "[l]anguage skills are considered by our senior commanders in the region to be as important as other basic combat skills."

18.     MEP represents that it "supports state and federal agencies, NGOs, international organizations, and global customers with linguists and interpreters, analysts, training, and program management in intelligence, defense, peace support, emerging markets and law enforcement operations."

19.     MEP represents that it has more than 6,000 employees and has "major offices" in Chantilly, Virginia; Lorton, Virginia; Augusta, Georgia; Columbus, Georgia; Fayetteville, North Carolina; Linthicum Heights, Maryland; and Mainz, Germany.

**B.      MEP's Screening and Supply of Linguists to the United States**

20.     On September 7, 2007, MEP was awarded Contract W911W4-07-D-0010 by the United States Government for the "Management and Support of Translation and Interpretation Services" for "Operation Enduring Freedom-Afghanistan."  See Exhibit A.

21.     The Executive Summary explains that the contract is designed to "rapidly and securely *recruit and deploy skilled contract linguists* with various foreign language capabilities

6

to provide translation and interpretation services." Ex. A at 3 (emphasis added). It further
explains that "[l]inguist services are required to permit our forces to communicate effectively
with the local populace, gather information for force protection, and interact with foreign
military units." *Id.* The contract is an "indefinite delivery, indefinite quantity" contract; it does
not specify a firm quantity of linguists to be provided, but allows the U.S. military to issue MEP
task orders "require[ing] linguist services based on man-hours, man-days, man-months, man-
years, task completion or number of linguists. *Id.* at 4.

   22. The scope of work required by the contract is described as follows:

> Contract linguist services allow our forces to communicate with the local
> populace, gather information for Force Protection, and interact with other foreign
> military units. This requirement includes performance-based services for the
> rapid recruitment and deployment of foreign language interpretation and
> translation type services in support of the U.S. Army, acting as the Executive
> Agent for DoD for translator and interpreter services. The interpreters and
> translators will be required to accompany military units during military missions.
> Services required within the scope of this contract includes skilled interpreters
> and translators in support of OEF-A related intelligence operations. . . . *This effort*
> *requires skilled contract linguists with various foreign language capabilities to*
> *support current intelligence efforts*.

*Id.* § 1.0 (emphasis added).

   23. MEP is required to engage in pre-screening to ensure that linguists have the skills
required to perform these duties. The contract imposes the following requirements:

> The contractor pre-screening process initiates the screening process for all
> candidate linguists. *Linguists must possess certain skills*, and meet specific
> security and medical requirements. *The contractor shall pre-screen each*
> *applicant to ensure that each individual meets these requirements.*

*Id.* § 2.1.2 (emphasis added).

   24. Under the contract, MEP is required, as part of its "pre-screening" process, to
recruit and ensure that linguists have the skills required by the contract for Category I,
Category II, and Category III linguists. Category I ("CAT I") linguists are linguists, generally

locally hired or hired from a region outside the Area of Operations, who do not require a security clearance.  The contract requires that "CAT I linguists shall have native proficiency in the SCRL (level 4 to 5) as defined by the Interagency Language Roundtable (ILR), and a working proficiency (ILR level 2+) in English."  *Id.* § 2.1.2.2.

25.     Category II ("CAT II") linguists are United States citizens; the contract requires that "CAT II linguists shall have native proficiency in the SCRL (ILR level 4 to 5) and a working proficiency in English (ILR level 2+)."  *Id.*

26.     Category III ("CAT III") linguists, generally U.S. citizens who possess a "Top Secret" security clearance, must have an ILR level 3 in the SCRL language and be fluent in English.  *Id.*  The contract states that "[n]ative proficiency in the SCRL language is preferred for Category III linguist, but is not required.  CAT III linguists shall meet at a minimum the criteria of ILR level 3."  *Id.*

27.     The contract requires MEP to screen applicants to ensure compliance with the language proficiency requirements.  Specifically, MEP is required to administer testing to linguist applicants to ensure that they possess the necessary interpreting and translation skills, including the following:  interpretation into and from English and the SCRL language(s); written translation of general and technical material into and from English and the SCRL language(s); interpreting aptitude; transcription of aural SCRL language material into written form; and advising supported commanders and organizations on the cultural and ethnic significance of documents.  *Id.* § 2.1.2.1.

28.     The ILR levels required by the contract were established by the Interagency Language Roundtable ("ILR"), a Federal interagency organization.  All United States Government agencies adhere to the ILR Definitions as the standard measurement of language

proficiency.  To meet a specified ILR level, an individual must satisfy the requisite ILR level for

four different language skills:  speaking, reading, listening and writing.  The scale used to

describe each skill has six "base levels," ranging from 0 ("no proficiency") to 5 ("functionally

equivalent to a highly articulate well-educated native speaker/reader/etc.").  This scale is

accepted by all agencies of the federal government.

29.     To achieve an ILR level of 2+, an individual must have the following skills in the

referenced language:

**Speaking** (Limited Working Proficiency, Plus):  Able to satisfy most work
requirements with language usage that is often, but not always, acceptable and
effective.  The individual shows considerable ability to communicate effectively
on topics relating to particular interests and special fields of competence.  Often
shows a high degree of fluency and ease of speech, yet when under tension or
pressure, the ability to use the language effectively may deteriorate.
Comprehension of normal native speech is typically nearly complete.  The
individual may miss cultural and local references and may require a native
speaker to adjust to his/her limitations in some ways.  Native speakers often
perceive the individual's speech to contain awkward or inaccurate phrasing of
ideas, mistaken time, space and person references, or to be in some way
inappropriate, if not strictly incorrect.

**Listening** (Limited Working Proficiency, Plus):  Sufficient comprehension to
understand most routine social demands and most conversations on work
requirements as well as some discussions on concrete topics related to particular
interests and special fields of competence.  Often shows remarkable ability and
ease of understanding, but under tension or pressure may break down.  Candidate
may display weakness or deficiency due to inadequate vocabulary base or less
than secure knowledge of grammar and syntax.  Normally understands general
vocabulary with some hesitant understanding of everyday vocabulary still evident.
Can sometimes detect emotional overtones.  Some ability to understand
implications.

**Reading** (Limited Working Proficiency, Plus):  Sufficient comprehension to
understand most factual material in non-technical prose as well as some
discussions on concrete topics related to special professional interests.  Is
markedly more proficient at reading materials on a familiar topic.  Is able to
separate the main ideas and details from lesser ones and uses that distinction to
advance understanding.  The individual is able to use linguistic context and real-
world knowledge to make sensible guesses about unfamiliar material.  Has a
broad active reading vocabulary.  The individual is able to get the gist of main and
subsidiary ideas in texts which could only be read thoroughly by persons with

much higher proficiencies.  Weaknesses include slowness, uncertainty, inability to discern nuance and/or intentionally disguised meaning.

**Writing** (Limited Working Proficiency, Plus):  Shows ability to write with some precision and in some detail about most common topics.  Can write about concrete topics relating to particular interests and special fields of competence.  Often shows surprising fluency and ease of expression but under time constraints and pressure language may be inaccurate and/or incomprehensible.  Generally strong in either grammar or vocabulary but not in both.  Weaknesses or unevenness in one of the foregoing or in spelling result in occasional miscommunication.  Areas of weakness range from simple constructions such as plurals, articles, prepositions and negatives to more complex structures such as tense usage, passive constructions, word order and relative clauses.  Normally controls general vocabulary with some misuse of everyday vocabulary evident.  Shows a limited ability to use circumlocutions.  Uses dictionary to advantage to supply unknown words.  Can take fairly accurate notes on material presented orally and handle with fair accuracy most social correspondence.  Writing is understandable to native speakers not used to dealing with foreigners' attempts to write the language, though style is still obviously foreign.

30.     To achieve an ILR level of 3, an individual must have the following skills:

**Speaking** (General Professional Proficiency):  Able to speak the language with sufficient structural accuracy and vocabulary to participate effectively in most formal and informal conversations in practical, social and professional topics.  Nevertheless, the individual's limitations generally restrict the professional contexts of language use to matters of shared knowledge and/or international convention.  Discourse is cohesive.  The individual uses the language acceptably, but with some noticeable imperfections; yet, errors virtually never interfere with understanding and rarely disturb the native speaker.  The individual can effectively combine structure and vocabulary to convey his/her meaning accurately.  The individual speaks readily and fills pauses suitably.  In face-to-face conversation with natives speaking the standard dialect at a normal rate of speech, comprehension is quite complete.  Although cultural references, proverbs and the implications of nuances and idiom may not be fully understood, the individual can easily repair the conversation.  Pronunciation may be obviously foreign.  Individual sounds are accurate: but stress, intonation and pitch control may be faulty.

**Listening** (General Professional Proficiency):  Able to understand the essentials of all speech in a standard dialect including technical discussions within a special field.  Has effective understanding of face-to-face speech, delivered with normal clarity and speed in a standard dialect on general topics and areas of special interest; understands hypothesizing and supported opinions.  Has broad enough vocabulary that rarely has to ask for paraphrasing or explanation.  Can follow accurately the essentials of conversations between educated native speakers, reasonably clear telephone calls, radio broadcasts, news stories similar to wire

service reports, oral reports, some oral technical reports and public addresses on non-technical subjects; can understand without difficulty all forms of standard speech concerning a special professional field.  Does not understand native speakers it they speak very quickly or use some slang or dialect.  Can often detect emotional overtones.  Can understand implications.

**Reading** (General Professional Proficiency):  Able to read within a normal range of speed and with almost complete comprehension a variety of authentic prose material on unfamiliar subjects.  Reading ability is not dependent on subject matter knowledge, although it is not expected that the individual can comprehend thoroughly subject matter which is highly dependent on cultural knowledge or which is outside his/her general experience and not accompanied by explanation.  Text-types include news stories similar to wire service reports or international news items in major periodicals, routine correspondence, general reports, and technical material in his/her professional field; all of these may include hypothesis, argumentation and supported opinions.  Misreading rare.  Almost always able to interpret material correctly, relate ideas and "read between the lines," (that is, understand the writers' implicit intents in text of the above types).  Can get the gist of more sophisticated texts, but may be unable to detect or understand subtlety and nuance.  Rarely has to pause over or reread general vocabulary.  However, may experience some difficulty with unusually complex structure and low frequency idioms.

**Writing** (General Professional Proficiency):  Able to use the language effectively in most formal and informal written exchanges on practical, social and professional topics.  Can write reports, summaries, short library research papers on current events, on particular areas of interest or on special fields with reasonable ease.  Control of structure, spelling and general vocabulary is adequate to convey his/her message accurately but style may be obviously foreign.  Errors virtually never interfere with comprehension and rarely disturb the native reader.  Punctuation generally controlled.  Employs a full range of structures.  Control of grammar good with only sporadic errors in basic structures, occasional errors in the most complex frequent structures and somewhat more frequent errors in low frequency complex structures.  Consistent control of compound and complex sentences.  Relationship of ideas is consistently clear.

31.     To achieve an ILR level of 4, an individual must have the following skills:

**Speaking** (Advanced Professional Proficiency):  Able to use the language fluently and accurately on all levels normally pertinent to professional needs.  The individual's language usage and ability to function are fully successful.  Organizes discourse well, using appropriate rhetorical speech devices, native cultural references and understanding.  Language ability only rarely hinders him/her in performing any task requiring language; yet, the individual would seldom be perceived as a native.  Speaks effortlessly and smoothly and is able to use the language with a high degree of effectiveness, reliability and precision for all representational purposes within the range of personal and professional

experience and scope of responsibilities.  Can serve as in informal interpreter in a range of unpredictable circumstances.  Can perform extensive, sophisticated language tasks, encompassing most matters of interest to well-educated native speakers, including tasks which do not bear directly on a professional specialty.

**Listening** (Advanced Professional Proficiency):  Able to understand all forms and styles of speech pertinent to professional needs.  Able to understand fully all speech with extensive and precise vocabulary, subtleties and nuances in all standard dialects on any subject relevant to professional needs within the range of his/her experience, including social conversations; all intelligible broadcasts and telephone calls; and many kinds of technical discussions and discourse.  Understands language specifically tailored (including persuasion, representation, counseling and negotiating) to different audiences.  Able to understand the essentials of speech in some non-standard dialects.  Has difficulty in understanding extreme dialect and slang, also in understanding speech in unfavorable conditions, for example through bad loudspeakers outdoors.  Can discern relationships among sophisticated listening materials in the context of broad experience.  Can follow unpredictable turns of thought readily, for example, in informal and formal speeches covering editorial, conjectural and literary material in any subject matter directed to the general listener.

**Reading** (Advanced Professional Proficiency):  Able to read fluently and accurately all styles and forms of the language pertinent to professional needs.  The individual's experience with the written language is extensive enough that he/she is able to relate inferences in the text to real-world knowledge and understand almost all sociolinguistic and cultural references.  Able to "read beyond the lines" (that is, to understand the full ramifications of texts as they are situated in the wider cultural, political, or social environment).  Able to read and understand the intent of writers' use of nuance and subtlety.  The individual can discern relationships among sophisticated written materials in the context of broad experience.  Can follow unpredictable turns of thought readily in, for example, editorial, conjectural, and literary texts in any subject matter area directed to the general reader.  Can read essentially all materials in his/her special field, including official and professional documents and correspondence.  Recognizes all professionally relevant vocabulary known to the educated non-professional native, although may have some difficulty with slang.  Can read reasonably legible handwriting without difficulty.  Accuracy is often nearly that of a well-educated native reader.

**Writing** (Advanced Professional Proficiency):  Able to write the language precisely and accurately in a variety of prose styles pertinent to professional/educational needs.  Errors of grammar are rare including those in low frequency complex structures.  Consistently able to tailor language to suit audience and able to express subtleties and nuances.  Expository prose is clearly, consistently and explicitly organized.  The writer employs a variety of organizational patterns, uses a wide variety of cohesive devices such as ellipses and parallelisms, and subordinates in a variety of ways.  Able to write on all

topics normally pertinent to professional and educational needs and on social issues of a general nature.  Writing adequate to express all his/her experiences.

32.       To achieve an ILR level of 5, an individual must have the following skills:

**Speaking** (Functionally Native Proficiency):  Speaking proficiency is functionally equivalent to that of a highly articulate well-educated native speaker and reflects the cultural standards of the country where the language is natively spoken.  The individual uses the language with complete flexibility and intuition, so that speech on all levels is fully accepted by well-educated native speakers in all of its features, including breadth of vocabulary and idiom, colloquialisms and pertinent cultural references.  Pronunciation is typically consistent with that of well-educated native speakers of a non-stigmatized dialect.

**Listening** (Functionally Native Proficiency):  Comprehension equivalent to that of the well-educated native listener.  Able to understand fully all forms and styles of speech intelligible to the well-educated native listener, including a number of regional and illiterate dialects, highly colloquial speech and conversations and discourse distorted by marked interference from other noise.  Able to understand how natives think as they create discourse.  Able to understand extremely difficult and abstract speech.

**Reading** (Functionally Native Proficiency):  Reading proficiency is functionally equivalent to that of the well-educated native reader.  Can read extremely difficult and abstract prose; for example, general legal and technical as well as highly colloquial writings.  Able to read literary texts, typically including contemporary avant-garde prose, poetry and theatrical writing.  Can read classical/archaic forms of literature with the same degree of facility as the well-educated, but non-specialist native.  Reads and understands a wide variety of vocabulary and idioms, colloquialisms, slang, and pertinent cultural references.  With varying degrees of difficulty, can read all kinds of handwritten documents.  Accuracy of comprehension is equivalent to that of a well-educated native reader.

**Writing** (Functionally Native Proficiency):  Has writing proficiency equal to that of a well educated native.  Without non-native errors of structure, spelling, style or vocabulary can write and edit both formal and informal correspondence, official reports and documents, and professional/ educational articles including writing for special purposes which might include legal, technical, educational, literary and colloquial writing.  In addition to being clear, explicit and informative, the writing and the ideas are also imaginative.  The writer employs a very wide range of stylistic devices.

33.       In addition to requiring that linguists in the specified categories have the specified

skills and meet specified ILR proficiency levels, the contract also requires MEP to "implement a

complete quality control program that identifies potential and actual problem areas in providing

requirements of the contract . . . and the results of corrective actions taken throughout the life of the contract." Ex. A § 2.5.1.

34.     Under the contract, MEP "shall only be reimbursed for those candidates that successfully complete the screening process or for failed candidate where the contractor has properly completed and documented the required contractor pre-screening of candidates." *Id.* § 2.1.2.5.  Moreover, as explained below, the longer that MEP keeps a candidate in the pipeline – whether by sending them to MEP's Pre-Deployment Processing Center ("PDPC") even if they have failed their oral proficiency tests, by engaging them in "translation" work at the PDPC even if they have failed to demonstrate written translation skills, by moving them on to the CONUS Replacement Center ("CRC") at Fort Benning for military training, or through their deployment to Afghanistan or other locations – the larger the claim MEP can submit to the United States, and the greater its financial reward under its cost-plus agreement with the United States.

35.     As a company that has been involved with the recruitment, training, and supply of linguists since 2004, MEP is well aware of what these contractual requirements mean.  In testimony before Congress on July 26, 2010, MEP's CEO, Chris Taylor, testified that "[w]hether a linguist is a local national or a cleared U.S. citizen, MEP makes sure that he or she is properly vetted and appropriately trained.  Regarding vetting, each U.S. hire linguist is required to complete security, medical, and language pre-screening questionnaires regarding assignments in support of the U.S. military.  Once completed and determined to meet standards, U.S. candidates are administered an Oral Proficiency Interview (OPI) to evaluate their ability to converse in English and a targeted, required language.  *If a candidate passes*, he is brought to a pre-deployment processing site and re-screened for oral proficiency, as well as screened in reading and writing proficiencies in English and the target language(s).  In addition candidates receive

14

medical and dental screenings.  Once completed, U.S. candidates go through force protection and counterintelligence screenings.  If successful, U.S. candidates deploy to Fort Benning where the military re-screens them for dental and medical acceptability.  Prior to deployment, linguists receive training classes on topics ranging from working with the military to how to be an effective interpreter" (emphasis added).

36.    Similarly, with respect to CAT I linguists (hired outside the United States), Taylor told Congress that "Local National Linguists go through similar evaluations to include medical, oral proficiency, reading, and writing evaluations both in English and the required target language.  Following such screening, Local National Linguists receive counterintelligence and biometric screening."

37.    MEP's CEO also told Congress that "[f]or training, MEP completes an oral proficiency interview with each potential hire and then completes a more rigorous written test for each linguist before he or she is offered employment.  The standards for these language tests are set by the U.S. Government and are based on the Department of Defense's Inter-Agency Language Roundtable (ILR) standards."

### C.    Relator Paul Funk and MEP

38.    Relator Paul Funk has been involved in military support operations for almost thirty years.  For more than twenty-seven years he worked for Northrop Grumman, one of the leading defense contractors in the United States, and various predecessor entities (which merged into, or were acquired by, Northrop Grumman).  In that capacity, he provided support for the provision of more than 650 linguists in connection with the Desert Storm operation.  He also provided support for efforts to provide linguists in the second Iraq operation and in Afghanistan.  Mr. Funk has provided support services and worked with the United States military in numerous locations, including Bosnia, Kosovo, Iraq, and Afghanistan.

39.     Mr. Funk was hired by MEP in October 2007.  In October and November he worked with MEP officials to help MEP set up its PDPC, which was eventually located in Linthicum, Maryland.  In November 2007, Mr. Funk moved to Afghanistan, where he was to serve as MEP's Regional Manager in Afghanistan (Kandahar).  In late November, Mr. Funk returned to the United States because of a death in his family.  In December 2007, Mr. Funk was asked to become the Director of the PDPC.  He remained in that position until December 2008.

40.     As Director of the PDPC, Mr. Funk's responsibilities included supervising the language proficiency testing of prospective applicants whom MEP recruited to serve as translators and interpreters for the United States military.  As a result of his job responsibilities, Mr. Funk has direct and independent knowledge of MEP's fraudulent and unlawful conduct.

### D.     MEP's Fraudulent, Unlawful, and Discriminatory Conduct

41.     The paragraphs that follow describe MEP's fraudulent, unlawful, and retaliatory and discriminatory conduct.  Because most of the records pertaining to the time period in which Mr. Funk was employed by MEP are in the possession, custody, or control of MEP – not Mr. Funk – the dates provided below are based on the best information currently available to Mr. Funk.  More precise information should become available from MEP during the discovery process in this litigation.  The descriptions below are not intended to enumerate every interaction or communication between Mr. Funk and MEP, but describe, in considerable detail, the fraudulent activities engaged in by MEP and the actions taken by Mr. Funk.

42.     In late November 2007, Mr. Funk learned that MEP was not screening CAT I linguists in Afghanistan to ascertain their ILR level, as required by MEP's contract with the United States.  Mr. Funk learned this when he interviewed an MEP official who had responsibility for much of MEP's CAT I testing in the northern region of Afghanistan. Mr. Funk learned from this MEP official that instead of testing for ILR proficiency level, the MEP official

was simply meeting with candidates for approximately five minutes and either passing or failing them.  The MEP official had no knowledge of the ILR proficiency standards, was not evaluating candidates on that basis, and was not using a written test that evaluated a candidate's ILR proficiency level.

43.     In late November, Mr. Funk reported to Beth Theiss, who had HR responsibilities for MEP, that the company was not testing candidates for CAT I linguist positions in Afghanistan to determine whether they met ILR proficiency standards as required by its contract with the United States.  Ms. Theiss responded that this was outside the scope of her responsibilities.

44.     After returning to the United States and assuming a position as Director of the PDPC, Mr. Funk told MEP's Marc Peltier that MEP had a major problem because it was hiring linguists in Afghanistan to support the United States' military even though they were not being tested for ILR proficiency as required by MEP's contract with the United States.  Peltier told Funk that this would be taken care of.  In the next month, Mr. Funk also discussed MEP's failure to conduct the required testing of CAT I linguists in Afghanistan with Frank Marois, the Program Manager at the PDPC.

45.     In 2008, Marc Peltier was MEP's Senior Vice President for Operations and Administration.  (He subsequently became, and remains, MEP's Chief Operating Officer.)  As Senior Vice President for Operations and Administrations, Peltier is very familiar with MEP's practices of submitting claims and invoices to the United States seeking reimbursement (on a cost-plus basis) for the services and employees described below.  Peltier is also familiar with government contracting practices and the claims submitted to the Government in connection with such work, because – prior to securing a senior position at MEP – he had similar responsibilities

for years providing linguists to Afghanistan for another defense contractor.  David Slovina, MEP's Director of Recruiting, reported to Marc Peltier, as did Paul Clemens.

46.     As Director of the PDPC, Mr. Funk also learned in early 2008 that MEP was failing to screen candidates properly for Cat II and Cat III linguist positions in the United States. Candidates in the United States were located by MEP's Recruiting Department and then given oral proficiency tests to determine if they met the ILR standards for oral skills (i.e., speaking and listening in the Specified Contract Required Languages ("SCRL") and English).  This test was conducted and scored by a subcontractor – Language Learning Enterprises, Inc. ("LLE"), and later Ceiba Enterprises, Inc., dba Gracor Language Services, Inc. ("Gracor") – and the results were provided to MEP's central office in Columbus, Ohio.  LLE and Gracor would conduct the testing by telephone with the candidate.  If a candidate passed the oral proficiency test, they were to be sent by MEP to the PDPC in Linthicum, Maryland, where they would be given a written proficiency test.  While at the PDPC, candidates would also undergo medical and dental screening, certain forms of training, security screening by the 902nd Military Intelligence Group at Fort Meade, and other activities.

47.     If the individual received the required skill rating on the written as well as oral exams, the individual was then sent to the CONUS Replacement Center ("CRC") in Fort Benning, Georgia.  There, the individual would undergo the basic military training required for all contractors prior to deployment to Afghanistan or other locations.  This included verifying security, medical, and dental screenings, but not verification of language capabilities.

48.     For each stage in this process, MEP submits a claim and receives payment from the United States.  The longer an individual stays in this pipeline, the more money MEP will make.  Thus, if an individual is moved on to the PDPC for a two week period (as was commonly

18

the case in early 2008), MEP will invoice the United States for that time (and receive payment on a cost-plus basis).  If MEP continues to process the individual and send them to the CRC (typically for a multi-week period), it will invoice for additional amounts to cover this period.  And if the individual is then deployed to Afghanistan or another location, MEP will invoice the United States (and receive payments on a cost-plus basis) for the duration of their deployment.  Thus, by keeping an individual in the pipeline as long as possible, or deploying them to Afghanistan or another location, MEP maximizes the amount of its own claims to, and reimbursement from, the United States.  MEP submits written claims and invoices to the United States on a regular basis seeking reimbursement for the costs of employing and training each of these individuals.

49.     As Director of the PDPC in early 2008, Mr. Funk began receiving reports about individuals who did not have the skills required by the contract – indeed, some of them could barely speak English.  Mr. Funk also learned that LLE and MEP were conducting oral proficiency tests without confirming that the individual taking the test was the same person that was applying for a job as a linguist.  Based on his experience over many years, Mr. Funk was aware that over-the-phone testing, without clear confirmation of the candidate's identity and other quality controls, would facilitate and predictably result in fraud because competent language speakers could substitute for the applicant.

50.     This potential for fraud is particularly high because of the very substantial salaries paid by MEP to linguists.  A CAT II or CAT III linguist hired in the United States received a salary of up to approximately $1,000 per month or more while at the PDPC and CRC, and approximately $190,000 to $235,000 a year while deployed.  MEP pays these salaries, but then

makes a claim to the United States and is reimbursed for this expense and a substantial additional amount to cover the cost-plus requirements of the contract.

51.     In early 2008, Mr. Funk told David Slovina, the Director of Recruiting for MEP, that linguists who had already gone through the screening conducted by LLE and MEP in Columbus were being sent to the PDPC even though they did not have the language skills required by the contract.  Mr. Funk said that individuals were cheating on the oral proficiency tests.  When Mr. Slovina asked Mr. Funk how he knew people were cheating, Mr. Funk said he had spoken directly to individuals who had been sent to the PDPC and learned that they could not speak English.  Mr. Funk also told him that based on his experience, and the results he was seeing at PDPC, MEP's use of this form of over-the-phone testing was facilitating cheating.  Mr. Slovina indicated that he would take steps to get positive identification from individuals when they were being tested.

52.     Both Mr. Slovina and his superior, Marc Peltier, were aware that if individuals who did not meet the competency qualifications required by the United States were sent to the PDPC, sent to the CRC, or deployed to the United States, this would result in the submission of claims to – and receipt of payments from – the United States for linguists who were not, in fact, CAT II and CAT III linguists despite being presented as such in claims to the United States. Additionally, Mr. Peltier had been involved in the recruitment and hiring of linguists pursuant to contracts with the United States for years, both before his employment by MEP (when he worked at Titan/L3 and had similar job responsibilities relating to government contracts for linguists) and later at MEP.

53.     Indeed, the compensation and job performance systems set up by MEP, and implemented by Mr. Peltier and Mr. Slovina, were plainly based on recognition of this.  The

MEP recruiters managed by Mr. Slovina, as Director of Recruiting, and Mr. Peltier, as his supervisor, were compensated in part based on the stage in the deployment process that an individual recruit had reached – the farther recruits advanced in the pipeline, the more MEP would pay an individual recruiter.  Similarly, if a recruiter failed to advance a sufficient number of individuals through the various stages in the pipeline (PDPC, CRC, and deployment), he or she risked job loss, and recruiters were in fact terminated on this basis.  This system was based on the recognition by both Mr. Peltier and Mr. Slovina, by at least 2008, that MEP could submit larger claims to the United States if individuals remained in the process longer, resulting in greater reimbursement (and cost-plus payments) from the United States to MEP.

54.     In early 2008, after being informed by Mr. Funk that unqualified individuals were being sent to the PDPC, Mr. Peltier told Mr. Funk that when he discovered individuals at the PDPC who did not have the required language skills, he should just pass them through the PDPC and they would see what happened down the line.  In other words, even if individuals were incompetent and did not qualify as CAT II or CAT III linguists – as required by the contract and as represented by MEP in claims and invoices submitted to the United States – MEP would keep them in the pipeline and continue to make salary and other payments to these individuals which would then be reimbursed, with a cost-plus payment, by the United States.  Peltier said that MEP's goal was to get the maximum number of linguists through the PDPC.

55.     In or about February 2008, Mr. Funk was informed by Daniel Simms, an MEP employee under Mr. Funk's supervision, that individuals at the PDPC who submitted blank written examinations to determine ILR proficiency had received passing grades from LLE and MEP.  These written tests were administered by employees under Mr. Funk's supervision at the PDPC in Linthicum, and each individual's test answers were scanned and sent to LLE for

grading.  In the course of this, Mr. Simms discovered that blank exams sent to LLE had received ILR proficiency scores that purportedly met the standards in the contract with the United States. Mr. Simms alerted Mr. Funk to this fraudulent conduct.

56.     Mr. Funk told his superior, Frank Marois, the Program Manager at the PDPC, that individuals submitting blank written examinations were being given passing grades on these written tests by LLE and MEP.  Mr. Marois instructed Mr. Funk to contact LLE about this.  In or about February 2008, Mr. Funk contacted Bill Hingle at LLE, who told Mr. Funk that he would look into it.

57.     Mr. Funk subsequently received further information from Mr. Simms that this practice was continuing.  Mr. Simms found other examples of blank written test answers that were provided to LLE in or about February 2008, but these individuals then received grades by LLE and MEP that purportedly met the ILR proficiency standards.  These falsified grades were maintained in MEP's written and electronic records.

58.     Because of his position as a Director – and his supervisory and other responsibilities relating to testing – Mr. Funk was able to ascertain the test scores of individuals that were sent by MEP to the PDPC.  Mr. Funk learned that individuals who did not have the proficiency levels required by the contract were nevertheless being funneled to the PDPC by MEP.  Mr. Funk communicated to David Slovina, the Director of Recruiting, that MEP was sending individuals to the PDPC even though they had failed to achieve the required ILR standards on their oral proficiency tests.  Mr. Funk reiterated to Mr. Slovina the ILR standards required by the contract.  Mr. Slovina indicated that he would address this but, in fact, this practice continued.

59.     In or about this time, Mr. Funk also informed Mr. Marois that individuals were being sent to PDPC who could not read or write English, could not read or write Pashtu or Dari (the SCRL languages), and could barely speak English.

60.     On or about March 14, 2008, Mr. Funk prepared and submitted a Weekly Activity Report ("WAR") to MEP.  Mr. Funk believes this document was provided to numerous management officials at MEP, including Mr. Slovina and other Directors at MEP.  In this report, Mr. Funk reported that "Written Testing appears to be compromised" and that "Recruiting might consider similar issues for the OPI."  Although Mr. Funk did not have responsibility for the oral testing being conducted by MEP, he had also raised these issues directly with Slovina and other management officials at MEP.

61.     In the spring of 2008, Paul Clemens replaced Mr. Marois as Program Manager at PDPC.  Mr. Funk informed Mr. Clemens of the conduct described above.  Mr. Clemens told Mr. Funk that he "better get something in writing" indicating that these practices had been approved by the United States if he wanted to "stay out of jail."  On numerous occasions during the course of the events described herein, Mr. Funk contacted David Slovina and asked if there was anything in writing permitting PDPC to submit linguists who did not meet the contract requirements described above.  While Mr. Slovina would try to assure Mr. Funk that this would be or was being taken care of, neither Mr. Slovina nor anyone else at MEP provided any documentation that these practices were acceptable.  (Mr. Funk only recalls receiving a limited waiver pertaining to 2007 that did not support the practices described above.)

62.     On June 9, 2008, Mr. Funk communicated to Marc Peltier, Paul Clemens, and David Slovina that the Statement of Work ("SOW") "at the PDPC shows a 4 to 5 ILR as a contract requirement."  By this time, MEP had submitted and was continuing to submit claims to

the United States for  numerous individuals who MEP was describing as CAT I, CAT II and CAT III linguists even though they failed to meet the proficiency levels required for these positions.

63.     During this time period, MEP also changed the company that it used to conduct and grade language tests from LLE to Gracor.  Mr. Funk was asked to review the testing contract and warned MEP that it did not provide adequate safeguards.  These warnings were disregarded. The company MEP engaged to perform this critical function, Gracor, operates out of the home of its founders and owners, Thomas and Rosario Hubbard.  At or about the same time, the Hubbard's son began working for MEP, first as an intern in the Recruiting Department from June to September 2008 to "[a]ssist" the Department "in recruiting" linguists for Afghanistan, and since that time as a full-time MEP employee.  After MEP began using the Hubbards' home-based company to test and grade recruits, the number of recruits being funneled in "waves" to the PDPC materially increased.

64.     Because Mr. Funk was not employed by LLE or Gracor, discovery in this action will be appropriate to determine the full extent of their complicity and/or facilitation of MEP's fraudulent statements, false records, and false claims.  As described here, Mr. Funk became aware of passing grades being assigned to blank tests, advance test information (cheat sheets) being provided to recruits being moved through the pipeline, and test scores being changed and improved after the fact.  These fraudulent actions were taken during the time periods that LLE and then Gracor had responsibilities for grading exams and transmitting those grades to MEP.

65.     In or about July of 2008, Mr. Slovina instructed Mr. Funk to allow three individuals who had failed their written tests at the PDPC to retake the examinations.  The explanation provided was that one of the three had not had a dictionary at the time of the

examination.  When re-tested, each of the three individuals passed the written examination.   Mr.

Funk's Deputy Director, Idin Pirasteh, discovered – and reported to Mr. Funk – a "cheat sheet"

that had been used by one or all of these individuals for the re-examination.  This cheat sheet

contained written answers to the test questions.  Because the testing materials were not available

to individuals outside Gracor or MEP – and varied for different test sessions – these answers

were very likely provided to these individuals by officials or employees at MEP (or Gracor).  At

the time this cheat sheet was discovered by Mr. Pirasteh, Mr. Funk was in the midst of

investigating the matter.  The three individuals were questioned by Mr. Funk and others at the

PDPC, and they admitted that they had used the cheat sheet and cheated on the written exam.

They refused to identify who supplied them with the cheat sheet.

        66.     Shortly after Mr. Funk investigated and detected this attempt to cheat – and

learned that they had in all likelihood been assisted in these efforts by one or more MEP

employees who were aware of the test that would be used and the correct answers – MEP

responded by taking steps to restrict Mr. Funk's job responsibilities including, in particular, the

responsibilities of Mr. Funk and his staff relating to testing linguists.   Mr. Funk was informed by

his superior, Paul Clemens, that Mr. Funk's oversight of the written test process was being

removed and was being reassigned to David Slovina, the Director of Recruiting.

        67.     No rationale for this change was given to Mr. Funk.  This change meant that

officials in the Recruiting Department – who had made clear that their mission was to maximize

the number of linguists moving through the system, notwithstanding their failure to meet ILR

proficiency requirements, and were being compensated and rewarded based on those numbers –

would now have complete responsibility for "screening" the language skills of their recruits.

Recruiting was given sole responsibility for this notwithstanding the fraudulent practices that had

already attended oral proficiency testing and the Recruiting Department's overriding financial interest in moving as many people as possible through the MEP pipeline.

68.     This abrupt change not only limited Mr. Funk's job responsibilities, but also impeded the ability of Mr. Funk to investigate MEP's continuing fraud.  Because the responsibilities of Mr. Funk and his staff relating to the testing of candidates were being curtailed, MEP's screening process would become less transparent to Mr. Funk.  While his responsibilities relating to testing had previously permitted Mr. Funk to investigate or learn about the fraudulent practices described above, MEP's actions significantly limited this and ensured that its testing and screening practices would now be under the exclusive control of David Slovina and MEP's Recruiting Department.  This discriminatory and retaliatory action was taken in direct response to Mr. Funk's ongoing efforts to investigate, report, and remedy MEP's fraudulent activities, including it provision of unqualified linguists to the United States and related submission of claims to and receipt of payments from the United States for unqualified linguists who were being falsely depicted as CAT I, CAT II, or CAT III linguists.

69.     Moreover, in addition to Mr. Funk's own responsibilities regarding testing, the related responsibilities of his staff had significantly facilitated Mr. Funk's ability to discover the fraudulent activities described herein.  By eliminating Mr. Funk's job responsibilities relating to testing, MEP also curtailed the ability of other MEP employees under his supervision to detect MEP's fraudulent activities and report them to Mr. Funk.  Instead, MEP acted to vest these responsibilities exclusively in the Recruiting Department, notwithstanding its conflict of interest and demonstrated willingness to move individuals through the MEP pipeline even if they  failed to satisfy ILR proficiency requirements.

70. Despite MEP's efforts to restrict his responsibilities and prevent further investigation or actions regarding the ongoing fraud, Mr. Funk continued to take steps to ascertain the legality of MEP's practices. In or about August 2008, Mr. Funk spoke with David Slovina and again requested written documentation justifying the number of incompetent linguists that were being hired by MEP and presented to the United States as qualified linguists. Mr. Slovina claimed that he and Marc Peltier had received verbal approval and he would send Mr. Funk anything in writing if he received it. Mr. Funk requested that Mr. Slovina send him an e-mail confirming that MEP had received approval, but Mr. Slovina was unwilling to do so.

71. MEP did in fact hire numerous linguists during this period to support United States troops in Afghanistan or elsewhere that MEP knew had failed oral proficiency examinations, failed written proficiency examinations, or failed both. MEP submitted claims to the United States related to these individuals, falsely claimed that they were CAT I, CAT II, or CAT III linguists (even though MEP knew that they were not CAT I, CAT II, or CAT III linguists as expressly defined by MEP's contractual obligations with the United States), and received payments from the United States on this basis.

72. Although Mr. Funk does not have records that identify linguists who failed tests during the later months of his employment at MEP – and, as set forth above, MEP took actions to limit his responsibilities relating to testing and receipt of information that would reveal test results – MEP's fraudulent practices were continuing when he was forced to leave MEP in December 2008. Examples of linguists who received ILR ratings below the level specified in the contract, but nevertheless had completed the PDPC process or were further in the MEP pipeline from January to May 2008 include the following:

- Nasrullah Azad received failing scores in or about January 2008 and was then deployed by MEP to military theatre operations.

- Wali Khan received failing scores in or about January 2008 but completed the PDPC and, on information and belief, was sent to the CRC.
- Roya Qarizadah received failing scores in or about January 2008 and was then deployed by MEP to military theatre operations.
- Mohammad Haris received failing scores in or about January 2008 but completed the PDPC and, on information and belief, was sent to the CRC.
- Mohammad Rasuli received failing scores in or about January 2008 and was then deployed by MEP to military theatre operations.
- Masood Mahfooz received failing scores in or about February 2008 and was then deployed by MEP to military theatre operations.
- Ahmadshan Helman received failing scores in or about February 2008 and was then deployed by MEP to military theatre operations.
- Torpaakai Harari received failing scores in or about February 2008 and was then deployed by MEP to military theatre operations.
- Ahmad Helmandi received failing scores in or about February 2008 and was then deployed by MEP to military theatre operations.
- Ali Moshini received failing scores in or about February 2010 and was then deployed by MEP to military theatre operations.
- Manucher Wahab received failing scores in or about March 2008 and was then deployed by MEP to military theatre operations.
- Safoora Nejrabi received failing scores in or about March 2008 and was then deployed by MEP to military theatre operations.
- Tandar Dawaarzai received failing scores in or about March 2008 and was then deployed by MEP to military theatre operations.
- Ahmadwali Lodin received failing scores in or about March 2008 and was then deployed by MEP to military theatre operations.
- Sharif Haronee received failing scores in or about March 2008 and was then deployed by MEP to military theatre operations.
- Ahmadullah Ashrafi received failing scores in or about March 2008 and was then deployed by MEP to military theatre operations.
- Salahuddin Ahmadzai received failing scores in or about March 2008 and was then deployed by MEP to military theatre operations.
- Zabairullah Noori received failing scores in or about April 2008 and was then deployed by MEP to military theatre operations.
- Ali Musa received failing scores in or about April 2008 and was then deployed by MEP to military theatre operations.
- Rhamatullah Hassan received failing scores in or about April 2008 and was then deployed by MEP to military theatre operations.
- Khoja Hassan received failing scores in or about April 2008 and was then deployed by MEP to military theatre operations.
- Azizullah Hassan received failing scores in or about April 2008 and was then deployed by MEP to military theatre operations.
- David Asadi received failing scores in or about April 2008 and was then deployed by MEP to military theatre operations.

- Khadim Yousafi received failing scores in or about April 2008 and was then deployed by MEP to military theatre operations.
- Parwin Moore received failing scores in or about April 2008 and was then deployed by MEP to military theatre operations.
- Ahmad Amiri received failing scores in or about April 2008 and was then deployed by MEP to military theatre operations.
- Mark Zaman received failing scores in or about April 2008 and was then deployed by MEP to military theatre operations.
- Fnu Azizullah received failing scores in or about April 2008 but was sent by MEP to the PDPC for at least three weeks and completed the PDPC.
- Najiya Muhammad received failing scores in or about April 2008 but was sent by MEP to PDPC for three weeks and completed the PDPC.
- Amini Durrani received failing scores in or about April 2008, but was moved by MEP through its pipeline to the CRC.
- Noor Roadwwall received failing scores in or about May 2009 and was then deployed by MEP to military theatre operations.
- Qadir Khattak received failing scores but was sent by MEP to the CRC in or about May 2009.
- Abdullah Hotaki received failing scores but was sent by MEP to the CRC in or about May 2009.
- Ghulam Lomany receiving failing scores but was sent by MEP to the PDPC and completed the PDPC in or about May 2009.
- Shakeeba Ahmadi received failing scores but was sent by MEP to the CRC in or about May 2009.
- Sameer Sajid received failing scores but was sent to the CRC in or about May 2009.
- Nizam Haidary received failing scores but was sent to the CRC in or about May 2009.
- Tamim Saifi received failing scores but was sent to the CRC in or about May 2009.

73.     In or about September 2008, Mr. Funk was informed by John Bateman, an employee working under him at the PDPC, that other expenses billed by MEP to the United States involved "fraud, waste and abuse."  This fraud occurred in connection with claims submitted to the United States for translation work MEP asked its linguists to do at the PDPC on a project MEP called Document and Media Exploitation Cell ("DOMEX").

74.     Notwithstanding the fact that many of these individuals had failed the writing and reading proficiency tests, MEP instructed them to bill time at the PDPC under the DOMEX project translating documents.  Individuals working on DOMEX were scheduled to work only

two hours a day, but MEP submitted invoices and claims to the United States for eight hours of work each day.  In fact, MEP had neither sufficient work, nor adequate facilities, to support eight hours of work for individuals working on DOMEX.  Moreover, MEP employees were aware that individuals working on DOMEX were only being scheduled to work two hours each day.

75.     MEP management told Mr. Funk's Deputy at the PDPC, Idin Pirasteh, that if an individual working on DOMEX only entered two hours of work in time records, the records should be changed to reflect eight hours of work.  The purpose of preparing MEP time records, including false entries by the employees involved into MEP's Unanet time recordation system, that deliberately overstated the amount of work actually performed was to support the submission of claims and invoices to the United States seeking payment for these inflated work hours.  MEP's invoices to the United States, as described below, included false and overstated claims for reimbursement for this work and resulted in substantial overpayments to MEP.

76.     Mr. Funk complained to MEP management about this fraudulent overbilling.  He told his superior, Paul Clemens, that Mr. Bateman – who was the operations coordinator for this project – had explained to him that these billing practices constituted fraud, waste, and abuse. He also informed David Slovina, Director of Recruiting, about this fraudulent overbilling.  Mr. Funk believed that bills for DOMEX services that had not been performed were being submitted to the United States.  Mr. Clemens, Mr. Slovina, and others at MEP were also aware that it was MEP's standard practice to submit claims to the United States seeking reimbursement for expenses of this kind – indeed, this was central to MEP's business and profitability model – and thus knew that the reported conduct involved the submission of false statements and false claims for payment to the United States.

77.     MEP's fraudulent overbilling for these services to the United States began in or about August 2008 and continued into 2009.  MEP's regular practice was to bill the United States for eight hours a day for individuals working on DOMEX, even though they routinely worked only two hours.  Mr. Funk does not have DOMEX records, but does have per diem records that identify the linguists at PDPC during the relevant time period, including individuals who were at the PDPC more than one week.  MEP generally did not assign linguists to DOMEX until they completed their first week at the PDPC, and therefore those linguists with per diem records reflecting multiple weeks at the PDPC likely participated in DOMEX and engaged in the fraudulent practices described above.  MEP submitted false and overstated invoices and claims to the United States pertaining to the work allegedly being performed for these individuals.  The individuals involved included, by way of example:

- In or about August 2008 through at least November 2008, Yamah Tom Kwaga;
- In or about August 2008 through at least November 2008, Nasir Farooqi;
- In or about August 2008 through at least November 2008, Mohammad Ferozi;
- In or about August 2008 through at least November 2008, Rabia Hashemi;
- In or about August 2008 through at least November 2008, Naseer Khan;
- In or about August 2008 through at least November 2008, Yamah Mojadedi;
- In or about August 2008 through at least November 2008, Mustafa Nasafi;
- In or about August 2008 through at least November 2008, Wahab Raofi;
- In or about August 2008 through at least November 2008, Farzana Razimowar;
- In or about September 2008 through at least November 2008, Reda Al Ahmadi;
- In or about September 2008 through at least November 2008, Isac Alemi;
- In or about September 2008 through at least November 2008, Star Qurashi;
- In or about September 2008 through at least November 2008, Ahmad Safa;
- In or about September 2008 through at least November 2008, Bashir Wali;
- In or about September 2008 through at least November 2008, Urooj Abbas;
- In or about September 2008 through at least November 2008, Mohammad Ariasaif;
- In or about September 2008 through at least November 2008, Adela Ashpari;
- In or about September 2008 through at least November 2008, Noria Azizi;
- In or about September 2008 through at least November 2008, Qudratullah Wardak;
- In or about September 2008 through at least November 2008, Abas Ali;

- In or about September 2008 through at least November 2008, Mohammad Anwari;
- In or about September 2008 through at least November 2008, Naseem Anwari;
- In or about September 2008 through at least November 2008, Shukria Anwari;
- In or about September 2008 through at least November 2008, Mohammad Azimi;
- In or about September 2008 through at least November 2008, Habib Dada;
- In or about September 2008 through at least November 2008, Zahra Homayun;
- In or about September 2008 through at least November 2008, Zalmai Khalil;
- In or about September 2008 through at least November 2008, Zackeria Muradi;
- In or about October 2008 through at least November 2008, Atia Adel;
- In or about October 2008 through at least November 2008, Mohammad Amed;
- In or about October 2008 through at least November 2008, Mohammad Amiri;
- In or about October 2008 through at least November 2008, Bassir Ansary;
- In or about October 2008 through at least November 2008, Naser Arefi;
- In or about October 2008 through at least November 2008, Hooma Azizi;
- In or about October 2008 through at least November 2008, Hassen Baha;
- In or about October 2008 through at least November 2008, Adam Farid;
- In or about October 2008 through at least November 2008, Sayed Hamidullah; and
- In or about October 2008 through at least November 2008, Mohammad Helaly.

78.     Mr. Funk also learned that the fraudulent overbilling in connection with DOMEX was, essentially, a continuation or extension of similar overbilling that MEP was engaged in at Fort Benning, Georgia.  From approximately March 2008 through the summer of 2008, MEP assigned linguists at Fort Benning to work on a project entitled Document Exploitation ("DOCEX").  Although MEP did not have the resources at Fort Benning that would be necessary to support large numbers of linguists spending full days doing translation work, it is Mr. Funk's understanding that the overbilling that occurred at the PDPC in connection with the DOMEX project was a continuation of similar fraudulent billing practices that had commenced earlier at Fort Benning with DOCEX.

79.     In the fall of 2008, David Slovina met with Mr. Funk and made thinly veiled warnings regarding Mr. Funk's continuing actions relating to MEP's fraudulent conduct.  He communicated to Mr. Funk that the company "doesn't get you," that Mr. Funk needed to "get in

lock step with recruiting," and that the company needed to hit its numbers.  Mr. Funk indicated

that he would not send people who were incompetent and did not have the proficiency levels

required by the contract into the field.  He reiterated that Mr. Slovina knew that testing was being

compromised and that stand-ins were being used to take tests.  Mr. Slovina's actions and

statements implied that if Mr. Funk did not get in line, his job at MEP would be at risk.

80.     In or about October 2008, Mr. Funk contacted MEP's contracting office.  Mr.

Funk requested information regarding MEP's ability to purchase certain equipment through the

General Services Administration under its contract with the United States.  During the course of

this contact, he also inquired about whether MEP had received any documentation from the

United States that would permit it to depart from the standards and requirements in its contract

with the United States, and was told that the office would check and get back to him.  Shortly

thereafter, Mr. Funk was contacted by Paul Clemens, the PDPC Program Manager, and

reprimanded for this inquiry.  Mr. Funk was told he was not permitted to contact or speak with

MEP's contract administrators again.

81.     In the fall of 2008, Mr. Funk learned that individuals were being sent to the PDPC

even though they had failed to receive grades on English oral proficiency tests that met the

ILR 2+ standard required by MEP's contract with the United States.  For a brief period, the oral

test scores were sent to the PDPC with other information about individuals being sent to the

PDPC.  Mr. Funk was informed by an MEP employee, Anthonya Morales Torres, that

individuals were being sent even though their ILR levels from the oral proficiency tests were

below that required by the contract.  Mr. Funk and Ms. Torres reported to David Slovina and

Ashley Laurrey that these candidates could not be accepted.  After complaining of this, Ms.

Torres learned (and informed Mr. Funk) that the scores for these individuals were then changed

in MEP's records to indicate, falsely, that they had received passing scores on their oral proficiency examinations.

82.     In or about December 2008, Mr. Funk confronted Mr. Slovina about MEP's continuing actions to move individuals through the pipeline that did not meet the contract requirements, including its falsification of records relating to these individuals.  In connection with another individual who had progressed to the PDPC notwithstanding an insufficient score on the oral proficiency testing, Mr. Funk sarcastically told Mr. Slovina that he should just retroactively change the grade in MEP's system as MEP had done previously.

83.     Shortly after this, Mr. Funk learned about a financial issue involving the PDPC. The issue involved no wrongdoing of any kind by Mr. Funk.  Mr. Funk notified MEP headquarters in Columbus of the matter.  He was then contacted by company owner Greg Miller, one of MEP's owners.  Mr. Miller said that Marc Peltier was extremely angry with Mr. Funk and was insisting that he be fired.  Mr. Peltier had also falsely accused Mr. Funk of taking money. This accusation was baseless and was simply a pretext to force Mr. Funk out of his job because of his continuing investigation of MEP's fraudulent activities, his complaints about these fraudulent activities to MEP management, and the risk to MEP of potential liability under the False Claims Act.  The actions and persistent conduct that Mr. Funk described were unlawful and resulted in the submission of numerous false claims to the United States throughout this time period.  Mr. Funk's continuing investigation and complaints about these activities, and his unwillingness to ignore this unlawful conduct and get in "lock step" with recruiting, presented a clear danger to the company that it could be subject to liability under the False Claims Act. Indeed, the facts complained of by Mr. Funk not only could reasonably lead to a viable False Claims Act case, but demonstrated clear and continuing violations of the False Claims Act.

84.     By leveling accusations of financial misconduct against Mr. Funk, MEP was able to both threaten him and gain a pretextual basis for challenging his credibility if he later brought claims against MEP under the False Claims Act.

85.     The actions by MEP – including MEP's actions to restrict his job responsibilities; MEP's efforts to limit his ability to investigate and/or discover these fraudulent activities; MEP's admonition to Mr. Funk that he had to get in "lock step" with recruiting (notwithstanding the fraudulent activities described herein); its warning to Mr. Funk that Mr. Peltier insisted that he be fired; and numerous other actions described above – created a threatening and hostile work environment that made it impossible for Mr. Funk to continue at MEP and constructively discharged him from his position.  Mr. Funk's employment at MEP ended in December 2008.

86.     It is revealing that even today, the company uses these false accusations of financial impropriety by Mr. Funk as a pretext to discredit Mr. Funk's claims under the False Claims Act.  On September 8, 2010, in response to an ABC News story relating to Mr. Funk's claims, MEP issued a press release in which it stated that "Mr. Funk has no credibility."  It then says that Mr. Funk "resigned due to financial improprieties in his office," clearly trying to convey that Mr. Funk was involved in "financial improprieties."  In another recent press release, MEP asserted that Mr. Funk "resigned in 2008 over misuse of company funds."  Marc Peltier has also publicly asserted that Mr. Funk "offered to resign and resigned over financial improprieties."  All of these statements are not only untrue, they are intended to convey that Mr. Funk's allegation of violations of the False Claim Act should be disregarded because he is purportedly a disgruntled employee who resigned because he was involved in financial wrongdoing.   These statements are false and MEP knows they are false.  Indeed, MEP's public efforts to discredit his claims under the False Claims Act on this basis are directly contradicted

by its own internal documentation.  In these communications, one of the owners of MEP and a member of its Board of Directors, Greg Miller, acknowledged internally in January 2009 that Mr. Funk did "nothing inappropriate."  Nevertheless, MEP has used – and continues to use – allegations of Mr. Funk's involvement in "financial improprieties" to impugn his character and discredit his claims under the False Claims Act.

87.     In engaging in the fraudulent activities described above, MEP has submitted numerous false claims to the United States, has done so using false statements and records, and has received substantial reimbursement from the United States.  For example, during the period December 2007 through 2008 and continuing thereafter, MEP sent invoices to the United States on approximately a monthly basis seeking reimbursement for salaries and other costs related to each person at the PDPC, the CRC, and in the theatre of operations.  These invoices were sent to the United States by administrative personnel at MEP.  MEP officers and management – including, for example, Marc Peltier and David Slovina – were aware that the company regularly invoiced the United States and submitted claims related to the linguists and expenses described above.  In fact, as explained above, the job performance and compensation of employees in the Recruiting Department was based in significant part on their "success" in moving individuals through the pipeline described above – to the PDPC, the CRC, and into the theatres of military operations – precisely because they knew that progressing individuals through each stage meant that larger claims and invoices would be submitted to the United States for payment.

88.     Invoices submitted to the United States beginning in or about December 2007 and continuing through thereafter identified many of the individuals for whom reimbursement was being sought as CAT I, CAT II, or CAT III linguists.  Many of these representations, including representations relating to individuals described above, were false.  As explained above, MEP's

internal documents demonstrate that MEP knew that many of these individuals were not, in fact, CAT I, CAT II, or CAT III linguists.  Nevertheless, MEP presented them as such in claims to the United States for which it sought and received payment.

89.     On information and belief, approximately 20 of these invoices were submitted by MEP to the United States on approximately a monthly basis in connection with task orders issued under MEP's contract with the United States.

90.     These false claims and false records were sent by MEP's administrative/clerical personnel from MEP's facilities in Reston, Virginia to the Defense Finance and Accounting Service ("DFAS") payment office in Dayton, Ohio via the wide area work flow system accessed by MEP.

91.     The false claims and false records submitted to DFAS included claims for reimbursement for individuals who were being falsely represented as CAT I, CAT II, and CAT III linguists in the United States and Afghanistan and for alleged expenses that were being overbilled as described above.

92.     Throughout the period described above, Mr. Funk's investigation and complaints about MEP's fraudulent conduct made clear to MEP management officials that false and fraudulent records were being prepared in connection with employees and work for which MEP would be seeking reimbursement from the United States.  This conduct included, for example, preparing records showing that individuals had passed their proficiency tests, when in fact they had submitted blank tests or otherwise failed; changing failing test scores to create records showing that tests had been passed; and preparing false time records.

93.     The fraudulent conduct described by Mr. Funk also made clear to MEP management, including Mr. Slovina, Mr. Peltier, Mr. Clemens, and others, that MEP was

submitting false claims and invoices to the United States for payment.  All of the fraudulent

activities described by Mr. Funk were conducted in connection with MEP's performance of a

contract with the United States, for which it would regularly submit claims for payment to the

United States.  It was common knowledge to management at MEP – including Mr. Peltier, Mr.

Clemens, and Mr. Slovina – that the company regularly submitted claims to the United States

seeking payment and reimbursement for work that allegedly was being performed by MEP

employees and the movement of individuals that qualified as CAT I, CAT II, and CAT III

linguists through the MEP pipeline.  Indeed, the submission of these claims to the United States

was the core part of MEP's business model, and accounted for virtually all of the company's

revenues and profits.

      94.    The information and complaints of Mr. Funk also made clear to management that

these claims to the United States were false.  They were based in significant part on claims for

services that were not being performed and fraudulent practices relating to the competence and

qualifications of linguists for whom MEP was routinely seeking payment from the United States.

For example, Mr. Clemens' knowledge that the activities being reported by Mr. Funk involved

fraud and potentially criminal activity in the provision of services and claims to the United States

is evidenced by his statement to Mr. Funk that he had better secure documentation that such

activities had been authorized or he could go to jail.

      95.    By December 2008, MEP had been engaged in these fraudulent practices for a

lengthy period of time, and they were continuing when Mr. Funk was constructively discharged

from his position as a Director at MEP

96.    The discriminatory and retaliatory conduct described above have caused substantial financial damages to Mr. Funk including loss of his employment, reputational damages, and financial damages.

## COUNT ONE
### False Claims Act – Presentation of False Claims
### [31 U.S.C. § 3729(a)(1), 31 U.S.C. § 3729(a)(1)(A) as amended in 2009]

97.    Relator incorporates by reference the allegations made in the prior Paragraphs of this Complaint as though set forth herein in full.

98.    Through the acts described above, Defendant MEP and its agents and employees knowingly presented and caused to be presented to an officer or employee of the United States Government a false and/or fraudulent claim for payment or approval in violation of 31 U.S.C. § 3729(a)(1), and engaged in a fraudulent course of conduct for the purpose of securing payment for a false claim.

99.    The conduct described herein has resulted in substantial payments by the United States, and has caused significant damage to the United States treasury, based on payments of claims that were false and fraudulent.

## COUNT TWO
### False Claims Act – Making or Using False
### Record or Statement to Cause Claim to Be Paid
### [31 U.S.C. § 3729(a)(2),31 U.S.C. § 3729(a)(1)(B) as amended in 2009]

100.    Relator incorporates by reference the allegations made in the prior Paragraphs of this Complaint as though set forth herein in full.

101.    Through the acts described above and otherwise, MEP and its agents and employees knowingly made, used, and/or caused to be made or used false records and statements

in violation of 31 U.S.C. § 3729(a)(2) in order to get such false and fraudulent claims paid and approved by the United States Government.

102.    The conduct described herein has resulted in substantial payments by the United States, and damages to the United States treasury, based on statements and claims that were false and fraudulent.

## COUNT THREE
## False Claims Act Retaliation Violation
### [31 U.S.C. § 3730(h)]

103.    Relator incorporates by reference the allegations made in the prior Paragraphs of this Complaint as though set forth herein in full.

104.    Defendant MEP has a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking discriminatory or retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section.

105.    As set forth above, Mr. Funk engaged in numerous activities that are protected under the False Claims Act.  This includes his investigation of MEP's fraudulent activities; bringing this fraudulent and illegal activity to the attention of MEP management; refusing to participate in, assist, or ignore a scheme to defraud the government; and numerous actions to stem the FCA violations described above.

106.    Because the activities investigated, disclosed to management, and complained of by Mr. Funk were knowing, fraudulent, and involved the submission of false records and claims to the United States, Mr. Funk's activities created a distinct risk that MEP would be subject to litigation under the False Claims Act, and that such litigation was a reasonable possibility.

107.    Moreover, the conduct being investigated by Mr. Funk, and his disclosure to and confrontations with management about this fraudulent conduct, reasonably could have led to a viable action under the False Claims Act.  The conduct engaged in by MEP does, in fact, violate the False Claims Act and Mr. Funk's persistent efforts to ascertain, investigate, and complain about these fraudulent activities certainly could lead to a viable action under the FCA.

108.    Mr. Funk's protected activities were known to numerous management officials at MEP, as set forth above.

109.    Defendant MEP discriminated and retaliated against Mr. Funk because of his lawful actions taken in furtherance of a False Claims Act action.  This discrimination and retaliation included curtailment of Mr. Funk's job responsibilities, efforts to limit his ability to investigate the fraud, implied threats because of his protected activities (and failure to act in "lock step" with those engaged in this fraud), harassment, false charges of financial wrongdoing, and, ultimately, constructive discharge from his position as a Director at MEP.

110.    Defendant MEP's actions damaged and continue to damage Relator in violation of 31 U.S.C. § 3730(h).  This includes financial damages by virtue of his loss of employment and other financial damages caused by MEP's conduct.  In connection with this claim, Relator seeks all damages and other appropriate relief authorized by the False Claims Act, as well as litigation costs and reasonable attorneys' fees.

111.    Defendant MEP's misconduct and illegal treatment of Relator has the effect of stifling reports of military contractor fraud.  This treatment effectively warned MEP's other employees that they should not engage in honest and open reporting of Defendant's conduct.

112.    Pursuant to 31 U.S.C. § 3730(h), Relator is entitled to litigation costs, expenses, and reasonable attorneys' fees incurred in the vindication of his reputation and the pursuit of his retaliation claims.

### PRAYER FOR RELIEF

WHEREFORE, Relator Paul Funk requests that judgment be entered against Defendant MEP ordering that:

1.    The Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's actions, as well as a civil penalty against Defendant of not less than $5,500 and not more than $11,000, for each violation of 31 U.S.C. § 3729;

2.    Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal Civil False Claims Act;

3.    Relator be awarded all costs and expenses of this action, including attorneys' fees, pursuant to 31 U.S.C. § 3730(d);

4.    Relator be awarded all damages and other relief allowable under law because of Defendant MEP's unlawful discrimination and retaliation against Relator.

5.    That the Court award any other legal or equitable relief, including injunctive or declaratory relief if authorized by law, necessary to fully address and remedy the unlawful conduct alleged herein.

Dated:  October 7, 2010                   Respectfully submitted,


By:     / s / Steven J. Toll
                Steven J. Toll (Virginia Bar No. 15300)
                Kit A. Pierson
                David A. Young
                COHEN MILSTEIN SELLERS & TOLL PLLC
                1100 New York Avenue, N.W.
                Suite 500 West
                Washington, DC  20005
                Tel:  (202) 408-4600
                Fax:  (202) 408-4699
                stoll@cohenmilstein.com
                kpierson@cohenmilstein.com
                dyoung@cohenmilstein.com

                Mark Hanna (Virginia Bar No. 45442)
                Ann Lugbill
                Michelle Woolley
                MURPHY ANDERSON PLLC
                1701 K St., N.W., Suite 210
                Washington, DC  20006
                Tel:  (202) 223-2620
                Fax:  (202) 223-8651
                mhanna@murphypllc.com
                alugbill@murphypllc.com
                mwoolley@murphypllc.com

                Scott Newar
                700 Louisiana, 25th Floor
                Houston, Texas 77002
                Tel:  713-220-9155
                Fax:  713-223-9319
                newar@newarlaw.com

                *Counsel for Relator*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of October, 2010, I will electronically file the

foregoing **Relator's Second Amended Complaint** with the Clerk of the Court using the

CM/ECF system, which will then send a notification of such filing to the following:

Anthony Hotchkiss Anikeeff
Williams Mullen
8300 Greensboro Drive
Suite 1100
Mclean, VA  22102
aanikeeff@williamsmullen.com

Adam Casagrande
Williams Mullen
1700 Dominion Tower
999 Waterside Dr
Norfolk, VA  23510
acasagrande@williamsmullen.com

Jackson David Toof
Arent Fox LLP
1050 Connecticut Ave NW
Washington, DC  20036
toof.jackson@arentfox.com

Monika L. Moore
Gerard J. Mene
US Attorney's Office
2100 Jamieson Avenue
Alexandria, VA  22314
monika.moore@usdoj.gov
gerard.mene@usdoj.gov

Clinton Robert Shaw , Jr.
Ryan Allen Corle
Jordan Coyne & Savits LLP
1100 Connecticut Ave NW
Suite 600
Washington, DC  20036
c.shaw@jocs-law.com
r.corle@jocs-law.com

I also hereby certify that I will cause to be mailed a copy of the same document to the

above by First Class U.S. mail.

   / s / David A. Young
David A. Young
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, N.W.
Suite 500 West
Washington, DC  20005
Tel:  (202) 408-4600
Fax:  (202) 408-4699
dyoung@cohenmilstein.com