1

```
                    UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
                        ALEXANDRIA DIVISION

UNITED STATES EX REL          .        Civil Action No. 1:09cv296
PAUL FUNK,                     .
                               .
               Plaintiff,      .
                               .
     vs.                       .        Alexandria, Virginia
                               .        November 5, 2010
MISSION ESSENTIAL PERSONNEL,   .        10:32 a.m.
LLC,                           .
                               .
               Defendant.      .
                               .
.  .  .  .  .  .  .  .  .  .   .


                   TRANSCRIPT OF MOTION HEARING
               BEFORE THE HONORABLE LEONIE M. BRINKEMA
                   UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE RELATOR:              KIT A. PIERSON, ESQ.
                              DAVID A. YOUNG, ESQ.
                              Cohen Milstein Sellers & Toll PLLC
                              1100 New York Avenue, N.W.
                              Suite 500, West Tower
                              Washington, D.C. 20005
                                and
                              MARK HANNA, ESQ.
                              Murphy Anderson PLLC
                              1701 K Street, N.W., Suite 210
                              Washington, D.C. 20006
                                and
                              SCOTT NEWAR, ESQ. (by telephone)
                              700 Louisiana, 25th Floor
                              Houston, TX 77002


FOR THE DEFENDANT:            ANTHONY H. ANIKEEFF, ESQ.
                              Williams Mullen
                              8300 Greensboro Drive, Suite 1100
                              McLean, VA 22102

              (APPEARANCES CONT'D. ON FOLLOWING PAGE)

                        (Pages 1 - 21)

           COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

2

1   <u>APPEARANCES</u>:   (Cont'd.)

2   FOR THE DEFENDANT:              ADAM G. CASAGRANDE, ESQ.
                                    Williams Mullen
3                                   1700 Dominion Tower
                                    999 Waterside Drive
4                                   Norfolk, VA 23510

5   FOR INTERESTED PARTY UNITED     MONIKA L. MOORE, AUSA
        STATES OF AMERICA:          United States Attorney's Office
6                                   2100 Jamieson Avenue
                                    Alexandria, VA 22314
7
    ALSO PRESENT:                   ROBERT COZZIE, ESQ.
8
    OFFICIAL COURT REPORTER:        ANNELIESE J. THOMSON, RDR, CRR
9                                   U.S. District Court, Fifth Floor
                                    401 Courthouse Square
10                                  Alexandria, VA 22314
                                    (703)299-8595
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                           P R O C E E D I N G S

2               THE CLERK:  Civil Action 09-296, Paul Funk v. Mission

3       Essential Personnel, LLC, et al.  Would counsel please note their

4       appearances for the record.

5               MR. PIERSON:  Good morning, Your Honor.  Kit Pierson for

6       the relator, with Mark Hanna.

7               MR. ANIKEEFF:  Good morning, Your Honor.  Tony Anikeeff

8       for Mission Essential Personnel.

9               THE COURT:  All right.  Now, we have counsel from, is it

10      Texas?  Counsel from Texas is trying to call in.

11              MR. PIERSON:  Mr. Newar.

12              Your Honor, if I may also note for the record, I have

13      David Young from my law firm is with me.

14              THE COURT:  All right.

15              MR. ANIKEEFF:  And also for MEP we have Adam Casagrande,

16      who is a partner in my law firm, and Rob Cozzie, who is counsel

17      for MEP.

18              THE COURT:  Is anyone here from the United States?

19              THE CLERK:  Mr. Newar?

20              MR. NEWAR:  Yes.

21              THE CLERK:  Can you hear me?

22              MR. NEWAR:  I can.  Thank you, yes.  Can you hear me?

23              THE CLERK:  Yes.

24              THE COURT:  All right.  I'm sorry, would you put your

25      name on the record again?

4

1          MR. NEWAR:  My name is Scott Newar, for the relator.

2          THE COURT:  All right.  This is the defendant's second

3   motion to dismiss although first motion to dismiss the second

4   amended complaint, but in any case, it's the second time I'm

5   hearing a motion to dismiss this complaint.

6          The matter has been extensively briefed.  I don't need

7   to have you repeat what's in the papers, but I will give first of

8   all the defendant a moment or two if there's any additional

9   argument you want to make.

10          MR. ANIKEEFF:  Thank you, Your Honor.  One thing we

11   would note at the outset is that we took to heart Your Honor's

12   comments at the last hearing, where you suggested that the last

13   complaint had meat on the bones and you suggested the allegations

14   were quite significant.

15          We have spent the last few weeks looking at that, and we

16   have looked carefully at the second amended complaint, and it is

17   not lightly that we come back, but we do come back because we

18   believe that in the second amended complaint, besides dropping LLE

19   and Gracor and a number of allegations that were made against us,

20   that if you dip down one level into this complaint and not look at

21   in the artful manner that it was pled sort of in gross, that there

22   was this large scheme, the complaint fails in each area of

23   allegation, and what I mean is the allegations about the CAT I

24   linguists in Afghanistan as to which out of a 42-page complaint

25   there is but one -- two sentences in two paragraphs as to an

5

1    unidentified person engaging in some discussion, with no mention

2    of any linguists whatsoever, that any were passed through.

3            The consequence of going forward on that basis is to

4    require us to go into a war zone and tie up our people and try and

5    figure that out.  I assure you we've been trying to figure out

6    what that allegation is about, and we cannot.

7            And Mr. Pierson has been kind enough to tell me that

8    Mr. Funk -- I believe I'm being correct -- doesn't know the

9    identity of the official as to whom he's making the allegation.

10   At least that was the situation a couple weeks ago.  As to that,

11   we feel there is an utter failure of proof.

12           We mentioned the, the various task orders and amendments

13   simply to point out that we believe that Mr. Funk didn't

14   understand --

15           THE COURT:  And that may be correct, but, you know, the

16   problem even in this post-*Iqbal-Twombly* era, it cannot and it

17   isn't in this court going to convert motions to dismiss for

18   motions for summary judgment.

19           The issue about the work orders or task orders is very

20   interesting, and it may be a very effective defense down the road,

21   but I don't see how the Court can in any respect consider that in

22   evaluating whether the complaint if looked upon by -- in its four

23   corners sufficiently alleges causes of action, sufficiently puts

24   the defendant on clear notice as to what it is the plaintiff is

25   alleging and how you would go about defending against it.

6

1          I mean, you now know that one of the ways you're going

2     to defend against some of these claims is to say, well, the

3     contract says one thing that sets out the general parameters of

4     the business relationship, but the specifics are in these orders,

5     these task orders or work orders that come through.

6          I think to require a plaintiff to start pleading to that

7     degree of specificity basically means putting the entire case out

8     at the very beginning, and I don't think that the law has reached

9     that point yet.

10         MR. ANIKEEFF:  All right.  The one, the one point we'd

11    make with regard to that is his entire case is based on the

12    contract.

13         THE COURT:  I understand.

14         MR. ANIKEEFF:  And the contract, base contract, if he'd

15    rely on that, he has no case, because there is no -- there is not

16    a penny allocated, there isn't a single linguist ordered under the

17    base contract, as we point out in both our opening brief and

18    closing, so he doesn't have a case.  The contract upon which he

19    relies is the entire document, and we've added that portion that

20    pertains.

21         I would note that our case -- our motion doesn't fail if

22    Your Honor decides not to consider the technical exhibits, because

23    the point that comes out of the technical exhibits is that the

24    government was waiving the reading and writing requirements.  Even

25    without Your Honor considering those technical exhibits, as we've

7

1    briefed, the complaint fails in that regard, which I can -- and

2    just to focus on the reading and writing, there are only two

3    allegations.  There were blank pieces of paper that got a passing

4    grade, and there were three people who were caught cheating.

5            That is the entirety of the reading and writing

6    allegation of fraud as to which we're supposed to spend hundreds

7    of thousands of dollars defending.  Well, there's no allegation

8    that any of those three or four people in February of 2008, not at

9    any other time, went forward.

10           There's the color of it.  There's the illusory image

11   that there's lots here because Mr. Funk was complaining a lot, but

12   how do we go from those two people to show fraud?

13           THE COURT:  Well, one of the ways we can go there is we

14   can very narrowly tailor the discovery in this case, and one of

15   the advantages of having the degree of specificity that is now in

16   the complaint, I think, is very -- and you have Judge Anderson as

17   your magistrate judge.  Now, you haven't had the -- have you had

18   your initial rule 16?

19           MR. ANIKEEFF:  Well, Your Honor, we have spent --

20           THE COURT:  You're into discovery now; that's right.

21           MR. ANIKEEFF:  We have spent a half a million dollars

22   already.  We are burning rates at $100,000 a week.

23           THE COURT:  Well, that's the problem with litigation,

24   but let me just ask you this:  In the discovery that's been done

25   so far, I mean, you've got the names of the individual

8

1   interpreters or translators who appear to be defective somehow.

2   Have you tracked that down?

3        MR. ANIKEEFF:  We are, Your Honor, and that's another

4   point.  There's no connection between that list of people and any

5   of the allegations that have been made.  He hasn't alleged that

6   the three cheaters are on that list.  He hasn't alleged that the

7   people who turned in blank sheets are on that list.  That's the

8   disconnect here, Your Honor.

9        He's made very narrow allegations about fraud:  blank

10  sheets and cheaters, and then he's giving you this list about

11  which he has not said there's any violation of a written test

12  standard or any violation of the OPI standard.

13       Now, there may be some detail there, but it's not a --

14  if there's no substantial -- there is no plausible claim of fraud

15  when you disconnect those two.

16       THE COURT:  All right, let me hear from the plaintiff.

17       MR. PIERSON:  Your Honor, let me just --

18       THE COURT:  I want you to address this issue first of

19  all about the work orders or the task orders, that they are, in

20  fact, the operative document that really starts the, that starts

21  the claims process in the sense that it is that order that

22  indicates the specific job the government wants done, and it's

23  responding to that order that would result in an invoice or claim

24  to the government.

25       MR. PIERSON:  Your Honor, I think -- No. 1, I think it's

1   factually wrong, I think it's procedurally wrong, and I think at

2   the end of the day, the work orders don't really help them that

3   much.  In some respects, they actually hurt them, which is a point

4   they really ignore in their brief.

5          The contract itself sets forth requirements that they

6   have to meet.  They're explicitly in the contract.  It's a

7   contract they have to perform under, and the notion that a relator

8   then has to find task orders which he doesn't even have in his

9   possession that are issued the next year, two years,

10  two-and-a-half years, I mean, that's just something that --

11         THE COURT:  All right, but you've had some discovery at

12  this point.

13         MR. PIERSON:  Your Honor, we're basically just getting

14  their documents now.  They're voluminous.

15         And what I would say about the discovery we're getting,

16  Your Honor, I think there are two points I want to emphasize about

17  the work orders.  The documents they've submitted, what they

18  basically say are they, they may waive written and reading

19  requirements.  They reaffirm the oral proficiency exams, and they

20  sort of basically repeatedly say that complying with the oral

21  proficiency requirements is required by the contract.

22         So to the extent their argument is that there's a

23  waiver, the documents they're relying on only show a very -- a

24  narrow waiver that reiterates other aspects of the contract.

25         The second point, Your Honor, I'd make, which I think

10

1   highlights the factual nature of this and the appropriateness of

2   discovery, is the position they're taking regarding those

3   documents flatly, squarely contradicts their testimony to

4   Congress.  You know, they have testified in front of Congress.

5   Their CEO has testified to Congress -- and it's attached as

6   Exhibit 1, I think, to their brief -- that they are testing people

7   for reading and writing proficiency and they are testing them for

8   oral proficiency and that only people that pass the test using the

9   ILR standards are being sent over to Afghanistan.

10          That's the gist of our case.  It's what their CEO has

11  said to Congress, and I don't know whether it was under oath or

12  not, but he said it to Congress, and that's -- and our case is

13  that is not, in fact, what they're doing.

14          For them to come in here and argue that as a matter of

15  law they don't need to be doing any of this flatly contradicts

16  what they have told Congress.

17          The other point I would emphasize, Your Honor, is that,

18  you know, Tony and I have, we've both been practicing law a long

19  time now.  In terms of complaints that I've filed and in terms of

20  complaints that I've seen, when we were last in front of you, you

21  observed that there was far more meat on the bones of the

22  complaint than there ordinarily is in a case, and I think the

23  level of specificity now in this complaint is pretty extraordinary

24  in my practice.

25          I mean, the original complaint had about eight pages of

1  factual allegations.  This complaint has about 35 pages of

2  allegations.  It tells them the who; it tells them the what; it

3  tells them the when; it tells them the where.

4          And what they've done in their brief, Your Honor, when

5  you plead a case, when you plead a fraudulent scheme, I mean, this

6  scheme is an interconnected scheme.  The gist of it -- putting

7  aside the DOMEX allegation for a moment, the gist of it is that

8  they are not, is that they're not testing appropriately and

9  they're not -- and when people fail the test, they nevertheless

10 move them through the pipeline.

11         That's the gist of it, and there are a lot of

12 interconnected parts, and what they do is they try to take each of

13 the individual parts and say, well, gee, for that individual part,

14 for that specific allegation, which basically gives color and

15 explains the nature of the fraudulent scheme, where's every item

16 of detail for that allegation?

17         That's not what we're required to do.  What we're

18 required to do is tell them the who -- and in the case of a

19 corporate entity, what the Fourth Circuit has said is that the

20 corporate entity is enough of a who, but what we're required to do

21 is tell them the when, the what, the where, and in general terms

22 the who and the nature of the fraud, and that's what we've done.

23         It doesn't mean that for every particular allegation in

24 the complaint, you have to hit a laundry list for each of the

25 specific allegations.

1      So the short --

2      THE COURT:  Let me ask you this:  Mr. Anikeeff also

3   mentions this problem with the unknown witness in Afghanistan on

4   the Category I issue.

5      MR. PIERSON:  Yeah.  And what I would say about that,

6   Your Honor, is he's identified in the complaint with about as much

7   specificity as we can, what the complaint alleges is that Mr. Funk

8   interviewed the MEP employee that was responsible for testing or

9   had principal responsibility for testing in northern Afghanistan.

10      Mr. Funk doesn't know his name.  Mr. Funk does say in

11   the complaint that he reported that immediately afterwards --

12   immediately after the interview to Ms. Theiss, who is the director

13   of their Human Relations Department, reported it to Mr. Peltier,

14   and reported it to Mr. Marois.

15      So, you know, the point I would emphasize, Your Honor,

16   is that, you know, what *Harrison* teaches, and I think it's pretty

17   much its express words, is that courts should be hesitant to

18   dismiss a complaint under rule 9(b) when the defendant has what it

19   needs to defend the case.

20      They know what the allegations are.  If the allegation

21   about what is going on in Afghanistan is true, if they are, in

22   fact, testing people, they know exactly who to turn to to prove

23   their case, and in fact, they're in the course of trying to

24   prepare their defense right now.

25      So, you know, there's nothing about the allegations in

1   this complaint that in any way impede or inhibit their ability to

2   defend the case, and in fact, not only have we laid it out in the

3   complaint, I've sat down with them and told them, you know,

4   basically told them we'll answer any questions they have about

5   what we're alleging, what we're trying to prove.  I've given them

6   a list of all the witnesses that we think are relevant in the

7   case.  I mean, we could hardly do more.

8            And the notion that they are not in a position to defend

9   this case, I mean, it just -- I don't think it passes --

10           THE COURT:  All right.

11           MR. PIERSON:  It's just -- it's not a viable position,

12   Your Honor.

13           THE COURT:  All right.

14           MR. PIERSON:  If I can make one other observation just

15   to clarify one point in the brief, which I'd like to address the

16   retaliation claim, because they've cited a case that I don't think

17   was in their original brief, which was the *Owens* case in 2010, a

18   retaliation, and there was a point that it made in the *Owens* case

19   that I think is fundamental and helpful to understanding the

20   retaliation issue.

21           What *Owens* basically says is that to decide whether

22   someone's engaged in protected activity, you don't ask whether

23   they threatened, whether they threatened the False Claims Act.

24   They may not even know the False Claims Act exists, but what *Owens*

25   says is what we want to distinguish between our employers who just

14

1   in the regular course of their job are noting errors or things

2   that could be done better, we want to distinguish that from people

3   that are investigating or making complaints about things that

4   involve impropriety or illegality.

5          And there's simply no question here at multiple levels

6   that what Mr. Funk was investigating in good faith and complaining

7   about and refusing to participate in were concerns about, to use a

8   mild word, impropriety, and to use a stronger word, fraud.

9          THE COURT:  All right.

10         MR. ANIKEEFF:  One minute, Your Honor?

11         THE COURT:  Yes.

12         MR. ANIKEEFF:  Mr. Funk would like you to skip across

13  the wave tops and look at the sea broad.  We're not saying he has

14  to get into the weeds and plead every instance, but we're entitled

15  under 8(a) to something that's plausible, and the point is that

16  while he alleges this big, grand scheme and he's tied it all -- I

17  call it like a cotton candy fraud case, where there's lots of

18  ethereal wrapping around a core, but what's missing is just dig

19  down a little bit.

20         The OPI, which he says is addressed in the technical

21  amendments, well, there isn't a single allegation of any kind of

22  fraud.  He disagreed with a method by which they tested.

23         THE COURT:  All right.

24         MR. ANIKEEFF:  That's point one.  Two is to go back to

25  the contract concept.  The base contract does not order anything,

1   and so there can't be a fraud.

2          And lastly, with regard to retaliation, again, he

3   complained a lot, but the *Owens* case and *Gordon*, it has to be an

4   intolerable situation.

5          THE COURT:  Well, wait a minute.  There's a difference

6   between constructive discharge and retaliation.  Constructive

7   discharge, you're right, the conditions have to be so

8   overwhelmingly oppressive that a rational person wouldn't be

9   expected to put up with it.  That's one thing, but whether there's

10  been retaliation can be separate from that.  For example, a

11  demotion would be an act of retaliation if it's a material change

12  to -- a material adverse change to the terms and conditions of

13  employment.  They're a different concept.

14         MR. ANIKEEFF:  I agree.  And there was no retaliation.

15  The only, the only thing he suffered --

16         THE COURT:  Well, didn't he allege, though, that some of

17  his job duties were taken away?

18         MR. ANIKEEFF:  Well, he is -- he was no longer -- the

19  linguist testing responsibility was transferred to the recruiting

20  department, but he's still the PDPC director.

21         THE COURT:  Is it correct that the recruiting department

22  was to some degree, there was a financial incentive to getting a

23  certain number of people into the system?

24         MR. ANIKEEFF:  I have to go outside -- I mean, he's made

25  that allegation.  I can answer that.  There's a reward, but it was

1   not within their control.

2         In other words, the Recruiting Department recruits.

3   They put them into the process.  If someone comes out the other

4   end and is deployed, there's a reward at some point.

5         THE COURT:  So there is a --

6         MR. ANIKEEFF:  But they have no -- they can't do

7   anything other than put a person in the pipeline.

8         THE COURT:  Yeah, but, but there's still an incentive to

9   getting people out there into the field as certified translators

10  or interpreters.

11        MR. ANIKEEFF:  Their job is to go recruit, yes.

12        THE COURT:  Well, it's not as if they're paid on a

13  straight salary; in other words, you get paid $600 a week whether

14  you send zero people or a thousand people.

15        MR. ANIKEEFF:  They are paid a salary, and then if

16  someone comes out the other end, there is some type of a bonus.

17  There was at some periods of time.

18        THE COURT:  All right, all right.  I understand the

19  defendant's argument.  I think a lot of the -- I think a certain

20  amount of the argument was based on materials outside of the

21  record, but this complaint as revised, I think it meets the

22  necessary requirements of *Iqbal-Twombly* and rule 9 and rule 8.

23        I think the defendant is given fair and clear notice as

24  what the plaintiff's theory -- or the relator's theory of the case

25  is, the types of fraud that are being alleged.  Now, whether at

1    the end of the day when all the discovery is put together it flies

2    is another issue.  I'm therefore denying the motion to dismiss the

3    second amended complaint.

4              And I will also note that of all the False Claims Act

5    types of cases one could have, the nature of the, of the

6    contractual relationship, the nature of the product that's

7    supposed to be delivered here is so critical, when you think about

8    how our soldiers rely upon the interpreters in Afghanistan in

9    particular now that that's really the war zone and Iraq in the

10   past, that -- these types of contracts have to be fastidiously

11   complied with, and in this kind of a context, the issues are so

12   serious that if -- even if a close call, I would in this case tip

13   in favor of the plaintiff.  Let the light be shone upon the

14   situation, and at the end of the day, whether at a summary

15   judgment motion or at a trial, it will be resolved.

16             But I think this plaintiff has put on a number of

17   names -- I mean, you have specific people who have been identified

18   as inadequate.  I don't understand why that can't be quickly

19   tested unless all these folks are in Afghanistan or outside of our

20   reach, but I believe as I recall, some of these translators or

21   interpreters are U.S.-based, they come from the U.S., so I don't

22   know why they haven't been looked at.

23             I would think if the plaintiff's claims are correct,

24   there would be evidence from soldiers in the field, many of them

25   are now back here, that these interpreters couldn't interpret

1   their way out of a paper bag, or, you know, their English was so

2   bad, we never understood what they were saying, etc.

3          The issues in this case are very important, and they

4   need to go forward.  So the motion is denied, and we'll go ahead

5   and perhaps see you down the road at summary judgment.  Thank you.

6          MR. ANIKEEFF:  Your Honor, one point:  There is a

7   tremendous amount going on in this case.  Could we have leave for

8   21 days to answer the complaint?  We are in the middle of a huge

9   discovery.

10          THE COURT:  Is there any objection from the plaintiff?

11          MR. PIERSON:  Your Honor, we don't object to that, and

12   if I could -- we don't object to it.

13          THE COURT:  All right.

14          MR. PIERSON:  If I could make one quick observation,

15   counsel actually has an excellent relationship in this case --

16          THE COURT:  Good.

17          MR. PIERSON:  -- and it is a complex case, and I believe

18   that we will probably jointly be approaching the Court requesting

19   some modification of the schedule, because everyone is doing

20   everything they can.

21          We're also taking very seriously your instruction that

22   we should sit down together and sit down with the government.  I

23   think we are in agreement the case needs to be on a slightly, not

24   significantly, but a slightly slower track to get everything done.

25          THE COURT:  Well, given the fact that -- I would assume

1   some of the evidence is going to be coming in from Afghanistan?

2           MR. PIERSON:  I think that's likely.

3           THE COURT:  Yeah.  I will not be unsympathetic to that.

4           But again, Judge Anderson is also -- you've got a

5   phenomenal magistrate assigned to this case.  It's also a

6   situation where, you know, I suggested to you last time you might

7   want to get with him early rather than late and see if you can

8   resolve this dispute.

9           MR. PIERSON:  I think, you know, frankly, Your Honor,

10  just to sort of reiterate your point about the seriousness of the

11  nature of the allegations, I think, I think both Tony and I are in

12  agreement that it's a case that really calls on the parties to sit

13  down across with each other and perhaps a magistrate judge and the

14  United States and look at the evidence and see what we have and

15  see if that can be figured out sooner rather than later.

16          THE COURT:  Who's your contact attorney at the U.S.

17  Attorney's Office?

18          MR. ANIKEEFF:  It's Alan Gale is at the Main Justice

19  Department.  He's the senior attorney.

20          THE COURT:  You're not working with anyone at the U.S.

21  Attorney's Office?

22          MR. ANIKEEFF:  No.  They are not participating actively.

23          MR. PIERSON:  That's correct.

24          THE COURT:  Wait, wait.

25          MS. MOORE:  Your Honor, I'm Monika Moore for the United

1   States here participating as local counsel, and the United States

2   has declined to intervene in this case.  We are currently

3   monitoring it at this time, but we are staying apprised of

4   everything that's going on in the case.

5           THE COURT:  Well, have you actually decided not to

6   intervene, or are you still investigating?  Because this is one of

7   these qui tams, I believe, where I told the government you had to

8   fish or cut bait because you take so long to investigate.  So have

9   you decided now based on your investigation that you're not going

10  to intervene, or are you still investigating?

11          MS. MOORE:  I think that we filed a statement of no

12  position when the last deadline did come about, so I did misspeak,

13  Your Honor.  I don't know that an ultimate decision has been made.

14          THE COURT:  All right.  That's the impression that I had

15  as well.

16          MS. MOORE:  My apologies, Your Honor.

17          THE COURT:  All right, that's fine.

18          Well, again, as I've said, the case is now set to go

19  forward.  I think as soon as you-all have either met with Judge

20  Anderson or met between yourselves and figured out the discovery

21  plan in terms of what kind of extension you need and for what

22  reasons, I just won't give you a wholesale extension --

23          MR. PIERSON:  Understood.

24          THE COURT:  -- but if you specify to the Court what it

25  is that you need the extra time for and how much time you need,

21

1  I'll be glad to look at that.

2        MR. PIERSON:  We will, Your Honor, and I think we're

3  talking about on the order of 30 days.

4        THE COURT:  I don't think that's unreasonable.

5        So the defendant has 21 days in which to file an answer

6  to the complaint, and that should take care of everything for

7  today.  Thank you.

8        MR. PIERSON:  Thank you, Your Honor.

9        MR. ANIKEEFF:  Thank you, Your Honor.

10        THE CLERK:  Thank you, Mr. Newar.

11        MR. NEWAR:  Thank you.

12                        (Which were all the proceedings

13                          had at this time.)

14

15              CERTIFICATE OF THE REPORTER

16      I certify that the foregoing is a correct transcript of the

17  record of proceedings in the above-entitled matter.

18

19

20                          _____
                                        /s/
21                              Anneliese J. Thomson

22

23

24

25